## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

VOGUE INTERNATIONAL, LLC
d/b/a VOGUE INTERNATIONAL,
a Delaware limited liability company,

                              Plaintiff,

vs.

HARTFORD CASUALTY
INSURANCE COMPANY,
an Indiana corporation,

                              Defendant.

CASE NO.:

**COMPLAINT FOR:**

**DECLARATORY JUDGMENT**

---

## COMPLAINT FOR DECLARATORY JUDGMENT

In this insurance coverage case Plaintiff Vogue International, LLC d/b/a Vogue International (hereinafter "Vogue") sues for a declaratory judgment that: (1) its general liability insurer, Defendant Hartford Casualty Insurance Company (hereinafter "Hartford"), had a duty to defend Vogue in the underlying litigation styled as *Andrea Golloher, Marisa Freeman, Roberta Chase, James Hanks, Michael Shapiro, Brenda Brown, Gretchen Swenson, Crystal Kenny, Kelly Bottari, Renee Conover, and Shanisha Sanders, et al. v. Todd Christopher International, Inc. d/b/a Vogue International*, Case No. 3:12-cv-06002-RS, United States District Court for the Northern District of California (the "*Golloher suit*"); and (2) Hartford must reimburse Vogue for all the defense expenses it incurred in that action, plus prejudgment interest at the applicable legal rate from the date of invoice.

### THE PARTIES

1.       Plaintiff Vogue International, LLC d/b/a Vogue International is a limited

liability company organized under the laws of the State of Delaware. Its principal executive offices and place of business are located in Pinellas County, Florida. Vogue was previously known as Todd Christopher International, Inc. d/b/a Vogue International, and Todd Christopher International, LLC d/b/a Vogue International, both of which were registered in the State of Florida.

2.      On information and belief, Defendant Hartford is an Indiana corporation with its principal place of business in Hartford County, Connecticut.

## JURISDICTION

3.      This is an action for declaratory relief pursuant to 28 U.S.C. § 2201. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Vogue and Hartford, and there is more than $75,000 in controversy.

## VENUE AND APPLICABLE LAW

1.      Venue is proper in the United States District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1391(a)(c) in that the policy in dispute in this action was issued to Vogue in Clearwater, Florida.

2.      Venue is also proper in this District pursuant to 28 U.S.C. § 1391(a)(3). On information and belief, Hartford sells insurance and defends lawsuits in Florida, including in this District.

3.      This federal judicial district is the place of issuance under the Policy and Florida law governs Hartford's obligations to Vogue.

## THE HARTFORD POLICY

4.      Hartford issued to Vogue a succession of primary commercial general liability policies (№ 21 UUN UV6168) starting on September 11, 2003 and then renewed annually

until cancellation on March 1, 2009. The same policy forms were used from September 11, 2005 through March 1, 2009 (the "Policy"). A copy of the September 11, 2008 – March 1, 2009 Policy is attached as **Exhibit "1."**

5.      Hartford also issued to Vogue umbrella liability policies, but those are not the subject of this Complaint.

6.      The primary commercial general liability Policy provides coverage for "personal and advertising injury" arising out of an offense committed during the policy period, and defense of suits seeking damages because of "personal and advertising injury."

7.      Pertinent language from the Policy's main "Commercial General Liability Coverage Form," form HG 00 01 06 05, includes:

> **COVERAGE  B  PERSONAL  AND  ADVERTISING INJURY LIABILITY**
>
> **1.      Insuring Agreement**
>
> **a.**      We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages …
>
> **SECTION IV - DEFINITIONS**
>
> . . . .
>
> **17.**      "Personal and advertising injury" means injury . . . arising out of one or more of the following offenses:
> . . . .
>
> **d.**      Oral, written or electronic publication of material that … disparages a person's . . . goods, products or services.
> . . . .

**[Exhibit "1" (Form HG 00 01 06 05 pp. 5, 15, 17)]**

8.      Pertinent language from the Policy's "Cyberflex Amendment of Coverage B – Personal and Advertising Injury Liability," form HC 00 88 06 05, includes:

**COMPLAINT**

**CYBERFLEX AMENDMENT OF COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**
. . . .

This endorsement broadens coverage under HG 00 01 for your web site or internet related activities.

**A. Section V - Definitions** is changed as follows:
. . . .
**3. Definition of "Your Web Site"**

The following definition is added:

"Your web site" means a web page or set of interconnected web pages prepared and maintained by you, or by others on your behalf, that is accessible over an internet.

**[Exhibit "1" (Form HC 00 88 06 05 p. 1]**

## THE UNDERLYING *GOLLOHER SUIT*

9.      On October 25, 2012, a class-action lawsuit was filed against Vogue alleging that, from 2008 through 2012, plaintiffs were induced to purchase Vogue's "Organix" products by Vogue's marketing of these products as containing all or mostly "organic" ingredients. A copy of the initial complaint in the *Golloher suit* is attached as **Exhibit "2."**

10.      On August 9, 2013, plaintiffs filed a First Amended Complaint against Vogue. A copy of the First Amended Complaint is attached as **Exhibit "3."** This was plaintiff's only amendment of the complaint and the operative complaint when the *Golloher* suit settled.

11.      The First Amended Complaint includes the following allegations:

1.      This First Amended Complaint seeks to remedy the unlawful, unfair, and deceptive business practices of defendant Todd Christopher International, Inc. dba Vogue International ("Defendant" or "Vogue") with respect to its cosmetic products (also referred to as personal care products) sold under the Organix brand name (the "Products"). **The Products are advertised,** marketed, labeled, sold, and represented **as organic,** but are composed almost entirely from ingredients that are not organic. All of **the Organix Products are prominently marketed and labeled as "Organix," a name which was chosen to look and sound like the word "organics" in order to represent that the Products**

**COMPLAINT**

**are organic**. In addition, Defendant's marketing materials for the Organix Products are littered with statements that represent the Products as organic, and the front and back labels of some of the Products state that the Products contain organic ingredients. Plaintiffs and the Class reasonably believed Defendant's representations that the Products are organic. **But-for Defendant's false and misleading identification of the Products as organic the Plaintiffs and the Class would not have purchased the Products or paid such a high price for the Products** instead of purchasing truly organic products available from Defendant's competitors.

2.      Plaintiffs have, all along, perceived a need for resolution of the claims set forth in the original complaint on a nationwide basis. Since the filing of the original Complaint, facts evidencing liability have come to light that warrant this amendment. Joinder of additional states in this amendment is based on the same core counts and legal theories as were set forth in the original Complaint.

. . . .

4.      **Defendant's conduct of advertising**, marketing, selling, labeling, and **representing the Products as organic**, when in fact such Products are composed mainly of non-organic ingredients, constitutes unlawful, **unfair, and deceptive conduct** . . . and **harms the organic industry**. As such, Defendant's marketing . . . and advertising practices violate the consumer protection, unfair trade practices, and/or deceptive acts laws of all 50 states and the District of Columbia.

5.      California law expressly prohibits companies such as Defendant from engaging in this type of misleading labeling. . . . The Products are cosmetics that contain far less than 70% organically produced ingredients, excluding water and salt. Nevertheless, **Defendant** labels, sells, and **represents the products as organic.**

6.      Use of the Organix label calls into question other similar representations of products as organic, thereby denigrating the reputation of and eroding confidence in organic personal care products that comply with COPA as well as other regulatory provisions nationally.

. . . .

25.      **In 2006, Defendants introduced their "Organix" line of Products.** Although the Products contain very small quantities of organic ingredients, Defendants selected a brand name that looks nearly identical to, and sounds identical to, the word "organics," in order to exploit the growing consumer demand for organic products. To ensure that consumers made the association

5                                              **COMPLAINT**

between "Organix" and "organics," Defendants also emblazoned the word "organic' on the front label of the Products in bold type and littered their advertising materials with references to the Products' allegedly organic properties. Nevertheless, the Products are largely composed of ingredients which Defendants admit are not organic.

26.     Defendants' scheme to exploit consumer demand for organic products by **falsely advertising the Products as organic** has been extraordinarily successful . . .

. . . .

28.     . . . Although Vogue changed the description of its goods to secure USPTO approval of the trademark, Defendants did not change the formulation of the Products. In fact, the products all contain less than 10 percent organic ingredients – in most instances, far less.

29.     **Defendants advertise**, market, label, sell, and represent **the products as organic** . . .

30.     . . . the **Products from** each promotional cycle **always contain the word "Organix"** emblazoned on the front of the packaging in the same location, coloring, and font.

. . . .

32.     . . . In addition to concerns regarding the effect of non-organic chemicals on their own bodies, many consumers who embrace the "organic lifestyle" pursue such a lifestyle by purchasing organic products. By misleading consumers about its Products, Defendant undermines those efforts, misleading consumers to buy Defendant's non-organic products in lieu of truly organic ones.

33.     **Each year, Defendant has issued new and updated "Organix'-themed advertising in print and on its website, blog, Facebook page and Twitter account, as well as in other promotions and promotional tie-ins.** For example, in addition to noting the organic attributes of Defendant's products, such **"Organix"-themed advertising has, at different times, focused on Vogue's "green packaging," the environment, natural elements of the products, and the planet,** all of which Defendant used to retain customer interest as well as attract new customers.

. . . .

36.     . . . **In reliance on Defendants' claims that the Products are organic, Plaintiffs were willing to pay more for the Products than similar products that do not claim to be organic,** and in fact did pay a premium for the Products. . . .

. . . .

50.     . . . Each of the aforementioned laws prohibits **unfair and deceptive acts or practices** in the conduct of trade or commerce within that jurisdiction. The referenced conduct

includes that which directly and **indirectly** injures the Plaintiffs and Class members, by:

a.  Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of Defendant or Defendant's products;

b.  **Causing confusion or misunderstanding as to Defendant's or Defendant's Products' affiliation, connection, or association with, or certification by another;** ...

. . . .

f.  **Disparaging the goods, products, or business of another** by false or misleading representation of fact; . . .

51.  Defendants have engaged and continue to engage in conduct that is likely to deceive members of the public . . . This conduct includes, but is not limited to, **misrepresenting that the Products are organic when, in fact, the Products are not composed predominantly of organic ingredients.**

52.  Plaintiffs purchased the Products after reviewing the front of the label of such Product based on Defendants' representations that the Products are organic. Plaintiffs would not have purchased the Products at all, or would not have paid such a high price for the Products, but for Defendants' false promotion of the Products as organic. Plaintiffs have thus suffered damages. **[Exhibit "3" ¶¶1, 2, 4, 5, 6, 25, 26, 28, 29, 30, 32, 33, 36, 50, 51, 52] (emphasis added)**

## VOGUE'S NOTICE TO HARTFORD AND ITS DENIAL OF COVERAGE

12.  On November 21, 2012, Deborah Quiles, Vogue's insurance broker and an agent of Hartford, was notified of the underlying *Golloher suit* against Vogue. A copy of that communication is attached as **Exhibit "4."**

13.  In a letter dated December 14, 2012, Hartford denied that even potential coverage arose for the *Golloher suit*. A copy of that letter is attached as **Exhibit "5."**

14.  On August 12, 2013, Hartford was notified of the First Amended Complaint in the underlying *Golloher suit* against Vogue. A copy of that communication is attached as **Exhibit "6."**

15.  In a letter dated September 24, 2013, Hartford, after receiving the amended complaint, again denied that even potential coverage arose for the *Golloher* suit. A copy of that letter is attached as **Exhibit "7."**

16.    In the September 24, 2013 letter, Hartford stated:

> As stated in our correspondence dated December 14, 2012, there is no claim asserted that comes within the scope of coverage provided by the primary and umbrella general liability policies in effect September 11, 2008 to March 1, 2009, as there is no claim for damages arising out of a "personal and advertising injury," as that term is defined in the primary policy. Claims for false advertising do not constitute a covered offense. Further, even if the allegations contained in the First Amended Complaint asserted a potential "personal and advertising injury", which is denied, the policy contains exclusions including, without limitation, exclusion 2.g., titled Quality of Performance Of Goods – Failure to Conform to Statements, the excludes coverage for injury "arising out of the failure of goods, products or services to perform with any quality or performance made in your 'advertisement'", as well as exclusion 2.b which bars coverage for material published by or at the direction of the insured with knowledge of its falsity. Accordingly, Hartford has no contractual duty to defend Vogue and will take no further action in connection with the instant litigation. **[Exhibit "7"]**

17.    To this date, Hartford has steadfastly failed and refused to fully investigate and defend Vogue in the *Golloher suit*. Because Hartford has failed and refused to defend Vogue in the *Golloher suit*, Vogue has been forced to retain and pay defense counsel.

18.    Vogue has denied and defended against the allegations in the underlying complaints referenced herein and strongly contests the substantive underlying allegations. Vogue expressly denies the allegations against it in the underlying *Golloher suit*. Yet the *Golloher suit* alleged activity on the part of Vogue which created a potential for coverage under the Policy's "personal and advertising injury" coverage, especially when considered in conjunction with the inferences that can be drawn from those allegations and the potential for amendment of the underlying pleadings. Hartford's duty to defend extends to false, frivolous, or groundless suits, as Vogue believes the underlying suit to be.

19.    Vogue does not, by this Complaint or by reference to underlying allegations or inferences drawn from them, or observations about the potential for amendment, admit the truth of any of the underlying allegations. Vogue's alleged underlying conduct, as well as the

inferences drawn therefrom and the potential allegations that could be made upon amendment, are discussed only to demonstrate that they created a potential for insurance coverage by Hartford.

20.     Vogue's allegations in this coverage complaint explaining Hartford's duty to defend are based, not on true facts, but on the underlying allegations and inferences arising from those allegations as showing a potential for coverage, thereby triggering Hartford's duty to defend. Therefore, Vogue does not admit the truth of any underlying allegations but explains here how the underlying allegations under the language of Hartford's policies trigger Hartford's duty to defend Vogue.

## SETTLEMENT OF THE UNDERLYING ACTION

21.     On April 25, 2014, a Final Approval Order was entered in the underlying *Golloher suit* approving dismissal upon stipulation by the parties after settlement.  That settlement is currently being appealed.

22.     The attorneys' fees include fees incurred from the time of notice to Hartford on November 21, 2012 through the date of settlement with prejudgment interest recoverable from the date of invoice at ten percent (10%) per annum.  The nature of the duty to defend includes not only the defense obligation, but the appellate costs being incurred as well. Plaintiff is also entitled to any and all settlement monies deemed payable at such time as the settlement is confirmed.

## ALLEGATIONS OF EXPLICIT AS WELL AS IMPLICIT DISPARAGEMENT ESTABLISH A POTENTIAL FOR COVERAGE UNDER OFFENSE (d)

### A Three-Element Test Applies to This Offense

23.     The Policy defines "Personal and advertising injury" as having three elements relevant here: (1) "injury … arising out of"; (2) "oral, written or electronic publication of material"; (3) "that disparages a person's or organization's goods, products or services."

24.     Each of the three elements described in the preceding paragraph is potentially

**COMPLAINT**

met by the allegations of the *Golloher suit*, thereby triggering Hartford's duty to defend Vogue.

25.    The allegations about Vogue's conduct are sufficient to establish a potential for coverage under the Policy's "Personal and Advertising Injury" offense (d) – "Oral, written or electronic publication of material that … disparages a person's or organization's goods, products or services," thus triggering Hartford's duty to defend under the Policy.

### Element One Is Met: "Injury Arising Out Of" Offense (d)

26.    The Hartford Policy defines "personal and advertising injury" as any "injury … arising out of" a listed *offense.*

27.    "Arising out of," as used in the definition of "personal and advertising injury," is undefined in the Policy and is a term of much broader significance than "caused by." The term "arising out of" means "originating from," "having its origin in," "growing out of," "flowing from," "incident to," or "having connection with."

28.    "Arising out of," as used in the definition of "personal and advertising injury," does not require "proximate causation."

29.    The *Golloher suit* complaints allege Vogue's conduct "… directly and indirectly injures the [claimants] by: … (f) Disparaging the goods, products, or business of another by false or misleading representation of fact." **[Exhibit "2" ¶50]** The claimants also allege: "Plaintiffs would not have purchased the Products at all, or would not have paid such a high price for the Products, but for Defendants' false promotion of the Products as organic. Plaintiffs have thus suffered damages." **[Exhibit "2" ¶52]**

30.    The "injury arising out of" element is met in the *Golloher suit* complaints by the claimants' allegations that the "injury" they sustained "originated from," was "incident to" or "had a connection with" Vogue's disparagement of competing products and producers.

31.    Therefore the injury alleged in the underlying case potentially "arises out of"

offense (d).

**Element Two Is Met: "Oral, Written or Electronic Publication of Material"**

32.     The First Amended Complaint alleges:

> 25. [Vogue] . . . littered their advertising materials with references to the Products' allegedly organic properties . . .
>
> . . . .
>
> 33. **Each year, Defendant has issued new and updated "Organix"-themed advertising in print and on its website,** blog, Facebook page and Twitter account, as well as in other promotions and promotional tie-ins. For example, in addition to noting the organic attributes of Defendant's products, such "Organix"-themed advertising has, at different times, focused on Vogue's "green packaging," . . .which Defendant used to retain consumer interest as well as attract new customers. **[Exhibit "2" ¶¶25, 33] (emphasis added)**

33.     From these allegations it is reasonable to infer that Vogue was publishing statements that were disparaging to its competitors to consumers and the public-at-large.

34.     Unlike the offense for "copying, in your 'advertisement,' a person's advertising idea," the Policy's disparagement offense does not require an "advertisement."

35.     The undefined term "publication" requires only one recipient other than the one being disparaged.

36.     Nevertheless, the widespread publication of disparaging materials in retail locations, in "advertising materials," and on Vogue's website, blog, Facebook page, and Twitter account is expressly alleged in the allegations of the *Golloher suit* complaints.

37.     Falsity of the disparaging material is not a requirement of the Policy.

38.     Nevertheless, falsity of the disparaging material is alleged in the *Golloher suit*, e.g., "falsely advertising the Products as organic."

**Element Three Is Met: "Disparages a Person's or Organization's Goods, Products, or Services"**

39.     Hartford provides coverage for "damages because of ... injury arising out of ... oral, written or electronic publication of material that ... **disparages** a person's or

organization's goods, products or services."

40.     The *Golloher suit* complaints allege Vogue's conduct "… directly and indirectly injures the [claimants] by: … **(f) Disparaging** the goods, **products**, or business **of another** by false or **misleading representation of fact**." **[Exhibit "2" ¶50]** (emphasis added)

41.     The claimants allegations imply that Vogue's use of the term "organic" to market, advertise, and sell its product despite not containing primarily organic ingredients and thus misleading consumers harmed the organic industry and Vogue's competitors by calling into question the use of the term "organic" by competitors whose products comply with applicable regulations and by making an invidious comparison to its competitors, suggesting that Vogue's product is priced more competitively than its other truly organic counterparts.

42.     The facts alleged in the *Golloher suit* complaints fall within the ambit of the "disparagement" policy offense.

43.     The alleged promotion of Vogue's products as organic constitutes disparagement of the organic industry and Vogue's competitors who make organic products.

44.     To the extent there is any *factual* dispute about what occurred that would evidence disparagement, that possibility alone triggers a duty to defend.

## COUNT I

### Declaratory Relief – Duty to Defend

45.     Vogue incorporates the allegations in the above paragraphs of this Complaint as though fully alleged herein.

46.     Valid contracts existed between Vogue and Hartford, namely the Policy.

47.     Vogue fully performed all of the obligations and conditions to be performed by it under the Policy, or has been excused from performing them as a result of Hartford's

**COMPLAINT**

breach of its duty to defend.

48.    By selling the Policy, Hartford agreed to provide a defense for suits seeking damages for "personal and advertising injury" offenses as defined in the Policy.

49.    Vogue contends that the underlying *Golloher suit* complaints allege facts implicating the "personal and advertising injury" coverage under the Policy, thereby triggering Hartford's obligation to defend Vogue.

50.    Vogue is informed and believes that Hartford disputes the foregoing contentions.

51.    Hartford has denied and continues to deny that the *Golloher suit* complaints allege facts implicating coverage under the Policy, or state claims even potentially covered under the Policy, and has refused to defend Vogue in the *Golloher suit*.

52.    An actual bona fide controversy exists between Vogue and Hartford that requires judicial declaration by this Court of: (1) the parties' rights and duties under the Policy; (2) Hartford's duty to defend Vogue in the underlying *Golloher suit*; and (3) the amount of defense expenses owed by Hartford.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Vogue prays for judgment against Defendant Hartford as follows:

1.    A judicial declaration that Hartford had a duty to defend Vogue in the underlying *Golloher suit* under the Policy;

2.    A determination and award of general damages consisting of all reasonable defense expenses and settlement expenses incurred by Vogue in defense of the underlying *Golloher suit*;

**COMPLAINT**

3.      Award of pre-judgment interest accruing from the date of each defense invoice or any settlement payment deemed payable at such time as the settlement is confirmed, at the applicable statutory interest rate;

4.      Awarding Vogue costs of this suit, including reasonable attorneys' fees incurred in this action in accord with Section 627.428 Florida Statutes, plus interest on said fees at the highest rate allowed by law from the date of entry of judgment until paid in full;

5.      Award of all reasonable sums incurred to settle the *Golloher suit* deemed payable at such time as the settlement is confirmed;

6.      Such other and further relief as this Court may deem just and proper.


Dated:  September 24, 2014


By: _____
Lisa A. Oonk
Bar No.: 6238
Lisa A. Oonk, P.A.
3438 E Lake Rd.
Ste. 14 PMB 614
Palm Harbor, FL 34685
(727) 421-9549 (phone)
(727) 497-7911 (fax)
lisaoonk@gmail.com

Attorney for Plaintiff VOGUE
INTERNATIONAL, LLC d/b/a
VOGUE INTERNATIONAL

COMPLAINT

## EXHIBITS TO COMPLAINT

**EXHIBIT 1** - September 11, 2008 – March 1, 2009 Hartford Policy No. 21 UUN UV6168

**EXHIBIT 2** - Initial *Golloher* Complaint filed October 25, 2012

**EXHIBIT 3** - First Amended *Golloher* Complaint filed August 9, 2013

**EXHIBIT 4** - November 21, 2012 e-mail to Hartford's agent with notification of the underlying *Golloher suit*

**EXHIBIT 5** - Hartford's denial letter dated December 14, 2012

**EXHIBIT 6** - August 12, 2013 e-mail to Hartford's agent with notification of the First Amended Complaint in the underlying *Golloher suit*

**EXHIBIT 7** - Hartford's second denial letter dated September 24, 2013

**COMPLAINT**

# EXHIBIT 1

This SPECIAL MULTI-FLEX POLICY is provided by the stock insurance company(s) of The Hartford Insurance Group, shown below.

# COMMON POLICY DECLARATIONS

### THE HARTFORD

POLICY NUMBER: 21 UUN UV6168   K3
RENEWAL OF:  21 UUN UV6168

Named Insured and Mailing Address:
(No., Street, Town, State, Zip Code)

TODD CHRISTOPHER INTERNATIONAL
DBA VOGUE INTERNATIONAL
4027 TAMPA ROAD, SUITE 3200
OLDSMAR           , FL 34677
(PINELLAS COUNTY)

Policy Period:        From 09/11/08  To 09/11/09

12:01 A.M., Standard time at your mailing address shown above.

In return for the payment of the premium, and subject to all of the terms of this policy, we agree with you to provide insurance as stated in this policy. The Coverage Parts that are a part of this policy are listed below. The Advance Premium shown may be subject to adjustment.

Total Advance Premium:        $89,075.60

Coverage Part and Insurance Company Summary          Advance Premium

IN RECOGNITION OF THE MULTIPLE COVERAGES INSURED WITH THE HARTFORD, YOUR
POLICY PREMIUM INCLUDES AN ACCOUNT CREDIT.

PROPERTY CHOICE
HARTFORD CASUALTY INSURANCE COMPANY
HARTFORD PLAZA
HARTFORD, CT 06115                                        $51,306.00

LISTING OF ADDITIONAL COVERAGE PARTS CONTINUED ON THE FOLLOWING PAGE.

**Form Numbers of Coverage Parts, Forms and Endorsements that are a part of this policy and that are not listed in the Coverage Parts.**

HM0001 HM00100295SD IL00171198 IH09850108 IL00210702 PC00010103
HA00250204 HC00100798

Agent/Broker Name: **STAHL & ASSOCIATES INSURANCE**

PLAINTIFF'S
EXHIBIT
1
ALL-STATE LEGAL®

Countersigned by
(Where required by law)

_____        _____
Authorized Representative               Date

Form HM 00 10 01 07          ORIGINAL

PAGE   1 (CONTINUED ON NEXT PAGE)

EXH 1 - 1



**COMMON POLICY DECLARATIONS (Continued)**

**POLICY NUMBER:** 21 UUN UV6168

ADDITIONAL COVERAGE PARTS (CONTINUED)

COVERAGE PART AND INSURANCE COMPANY SUMMARY

ADVANCE PREMIUM

COMMERCIAL AUTO
HARTFORD FIRE INSURANCE COMPANY
HARTFORD PLAZA
HARTFORD, CONNECTICUT 06115

$   265.00

COMMERCIAL GENERAL LIABILITY
HARTFORD CASUALTY INSURANCE COMPANY
HARTFORD PLAZA
HARTFORD, CT 06115

$32,900.00

| | |
|---|---|
| FHCF EMER ASSESS CL | $808.39 |
| FL FIGA REG | $604.30 |
| FL FIGA EMG | $604.30 |
| FCIT Y2005 REG ASSESS | $1,853.20 |
| FCIT EMERG ASSESS | $650.51 |
| FLORIDA FIRE COLLEGE SURCHARGE | $79.90 |
| FL EMERGENCY MANAGEMENT SURCHARGE | $4.00 |

**Form HM 00 10 01 07**                    PAGE   2

EXH 1 – 2

# COMMERCIAL GENERAL LIABILITY
# COVERAGE PART - DECLARATIONS



**POLICY NUMBER:** 21 UUN UV6168

This COMMERCIAL GENERAL LIABILITY COVERAGE PART consists of:

A.  This Declarations;
B.  Commercial General Liability Schedule;
C.  Commercial General Liability Coverage Form; and
D.  Any Endorsements issued to be a part of this Coverage Part and listed below.

**LIMITS OF INSURANCE**

The Limits of Insurance, subject to all the terms of this Policy that apply, are:

| | |
|---|---|
| Each Occurrence Limit | $1,000,000 |
| Damage to Premises Rented to You Limit - Any One Premises | $300,000 |
| Medical Expense Limit - Any One Person | $10,000 |
| Personal and Advertising Injury Limit | $1,000,000 |
| General Aggregate Limit, (other than Products-Completed Operations) | $2,000,000 |
| Products-Completed Operations Aggregate Limit | $2,000,000 |

**ADVANCE PREMIUM:**

**AUDIT PERIOD:** ANNUAL AUDIT

Except in this Declarations, when we use the word "Declarations" in this Coverage Part, we mean this "Declarations" or the "Common Policy Declarations."

Form Numbers of Coverage Forms, Endorsements and Schedules that are part of this Coverage Part:

| | | | | |
|---|---|---|---|---|
| HC70010605 | CG00670305 | CG24041093 | HC00880605 | HC23700108 |
| HG00010605 | HG21020204 | CG02201207 | CG21331185 | HC21900901 |
| HC12101185T | | | | |

IH12011185   WAIVER OF TRANSFER RIGHTS OF RECOVERY AGAINST
             OTHERS CG2404

IH12011185   ABSOLUTE POLLUTION EXCLUSION EXCEPTION FOR
             DESIGNATED PRODUCTS OR COMPLETED OPERATIONS
             FORM CG2133

**Form HC 00 10 07 98**



*0500221UV61680101*   03953



# QUICK REFERENCE
# COMMERCIAL GENERAL LIABILITY COVERAGE PART
# OCCURRENCE

## READ YOUR POLICY CAREFULLY

**DECLARATIONS PAGES**

Named Insured and Mailing Address
Policy Period
Description of Business and Location
Coverages and Limits of Insurance

| | Beginning on Page |
|---|---|
| **SECTION I - COVERAGES** | |
| Coverage A - Bodily Injury and Property Damage Liability | Insuring Agreement ............................... 1 |
| | Exclusions ........................................... 2 |
| Coverage B - Personal and Advertising Injury Liability | Insuring Agreement ................................ 5 |
| | Exclusions ........................................... 6 |
| Coverage C - Medical Payments | Insuring Agreement ............................... 7 |
| | Exclusions ........................................... 8 |
| Supplementary Payments Coverages A And B ................................. 8 | |
| **SECTION II - WHO IS AN INSURED** ............................................. 9 | |
| **SECTION III - LIMITS OF INSURANCE** ........................................ 12 | |
| **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** ......... 13 | |
| Bankruptcy ....................................................................... 13 | |
| Duties in The Event Of Occurrence, Offense, Claim or Suit ............... 13 | |
| Legal Action Against Us ..................................................... 13 | |
| Other Insurance ................................................................ 14 | |
| Premium Audit ................................................................. 15 | |
| Representations ................................................................ 15 | |
| Separation of Insureds ...................................................... 15 | |
| Transfer of Rights of Recovery Against Others To Us ..................... 15 | |
| When We Do Not Renew ...................................................... 15 | |
| **SECTION V - DEFINITIONS** .................................................... 15 | |

**COMMON POLICY CONDITIONS**

Cancellation
Changes
Examination of Your Books and Records
Inspections and Surveys
Premiums
Transfer of Your Rights and Duties under this Policy

**ENDORSEMENTS**

These form numbers are shown on the Coverage Part - Declarations Page or on the Common Policy Declarations Page.

**Form HC 70 01 06 05**

© 2005, The Hartford
(Includes copyrighted material of Insurance Services Office, Inc., with its permission.)

*050221UV61680101*

03952

COMMERCIAL GENERAL LIABILITY
CG 00 67 03 05

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - VIOLATION OF STATUTES THAT GOVERN E-MAILS, FAX, PHONE CALLS OR OTHER METHODS OF SENDING MATERIAL OR INFORMATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2.**, Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability:

**2. Exclusions**

This insurance does not apply to:

**DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**B.** The following exclusion is added to Paragraph **2.**, Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:

**2. Exclusions**

This insurance does not apply to:

**DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

EXH 1 – 5



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CYBERFLEX
# AMENDMENT OF COVERAGE B - PERSONAL AND ADVERTISING INJURY

03955

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

This endorsement broadens coverage under **HG 00 01** for your web site or internet related activities.

**A. Section V - Definitions** is changed as follows:

**1. Definition Of Advertisement - Internet**

The following is added to Paragraph **a.** of the definition of "advertisement":

"Advertisement" means the widespread public dissemination of information or images that has the purpose of inducing the sale of goods, products or services through:

**a. (6)** The Internet;

**2. Definition of Personal And Advertising Injury**

**a. Your Web Site**

Paragraphs **f.** and **g.** of the definition of "personal and advertising injury" are replaced by the following:

"Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**f.** Copying, in your "advertisement" or on "your web site", a person's or organization's "advertising idea" or style of "advertisement";

**g.** Infringement of copyright, slogan, or title of any literary or artistic work, in your "advertisement" or on "your web site";

**b. Publication By Those With Unauthorized Access**

The following is added to the definition of "personal and advertising injury":

As used in this definition, oral, written or electronic publication includes publication of material in your care, custody or control by someone not authorized to access or distribute that material.

**3. Definition of Your Web Site**

The following definition is added:

"Your web site" means a web page or set of interconnected web pages prepared and maintained by you, or by others on your behalf, that is accessible over an internet.

**B.** Paragraph **2. Exclusions** of **Section I - Coverage B – Personal And Advertising Injury Liability** is changed as follows:

**1.** Exclusions **f., g.** and **i.** are replaced by the following:

**f. Breach Of Contract**

"Personal and advertising injury" arising out of any breach of contract, except an implied contract to use another's "advertising idea" in your "advertisement" or on "your web site";

Form HC 00 88 06 05

Page 1 of 2

© 2005, The Hartford
(Includes copyrighted material of Insurance Services Office, Inc., with its permission.)

EXH 1 – 6

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement" or on "your web site";

**i. Infringement Of Intellectual Property Rights**

"Personal and advertising injury" arising out any violation of any intellectual property rights such as copyright, patent, trademark, trade name, trade secret, service mark or other designation of origin or authenticity.

However, this exclusion does not apply to infringement, in your "advertisement" or on "your web site", of

**(1)** copyright;

**(2)** slogan, unless the slogan is also a trademark, trade name, service mark or other designation of origin or authenticity; or

**(3)** title of any literary or artistic work.

**2.** Exclusions **k.** - Electronic Chatrooms Or Bulletin Boards does not apply.

**3.** Subparagraphs **(1)**, **(2)** and **(3)** of Exclusion **p.** - Internet Advertisements And Content Of Others do not apply.

Form HC 00 88 06 05

EXH 1 – 7

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the stock insurance company member of The Hartford providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V –Definitions.

## SECTION I – COVERAGES
## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY
### 1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

d. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

e. Incidental Medical Malpractice

(1) "Bodily injury" arising out of the rendering of or failure to render professional health care services as a physician, dentist, nurse, emergency medical technician or paramedic shall be deemed to be caused by an "occurrence", but only if:

(a) The physician, dentist, nurse, emergency medical technician or paramedic is employed by you to provide such services; and

(b) You are not engaged in the business or occupation of providing such services.

HG 00 01 06 05

© 2005 The Hartford
(Includes copyrighted material of Insurance Services Office, Inc. with its permission.)

Page 1 of 18

EXH 1 – 8

(2) For the purpose of determining the limits of insurance for incidental medical malpractice, any act or omission together with all related acts or omissions in the furnishing of these services to any one person will be considered one "occurrence".

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

### f. Pollution

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible;

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire"; or

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g. **Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 51 feet long; and

(b) Not being used to carry persons for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft;

(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment"; or

(6) An aircraft that is not owned by any insured and is hired, chartered or loaned with a paid crew. However, this exception does not apply if the insured has any other insurance for such "bodily injury" or "property damage", whether the other insurance is primary, excess, contingent or on any other basis.

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors

working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)** and **(4)** of this exclusion do not apply to "property damage" arising from the use of elevators.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraphs **(3)** and **(4)** of this exclusion do not apply to "property damage" to borrowed equipment while not being used to perform operations at the job site.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Employment-Related Practices**

"Bodily injury" to:

**(1)** A person arising out of any "employment-related practices"; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any "employment-related practices" are directed.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**r. Asbestos**

**(1)** "Bodily injury" or "property damage" arising out of the "asbestos hazard".

**(2)** Any damages, judgments, settlements, loss, costs or expenses that:

**(a)** May be awarded or incurred by reason of any claim or suit alleging actual or threatened injury or damage of any nature or kind to persons or property which would not have occurred in whole or in part but for the "asbestos hazard";

**(b)** Arise out of any request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, encapsulate, contain, treat, detoxify or neutralize or in any way respond to or assess the effects of an "asbestos hazard"; or

**(c)** Arise out of any claim or suit for damages because of testing for, monitoring, cleaning up, removing, encapsulating, containing, treating, detoxifying or neutralizing or in any way responding to or assessing the effects of an "asbestos hazard".

**Damage To Premises Rented To You – Exception For Damage By Fire, Lightning Or Explosion**

Exclusions **c.** through **h.** and **j.** through **n.** do not apply to damage by fire, lightning or explosion to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" arising out of an offense committed by, at the direction or with the consent or acquiescence of the insured with the expectation of inflicting "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral, written or electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral, written or electronic publication of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's "advertising idea" in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services.

**i. Infringement Of Intellectual Property Rights**

"Personal and advertising injury" arising out of any violation of any intellectual property rights such as copyright, patent, trademark, trade name, trade secret, service mark or other designation of origin or authenticity.

However, this exclusion does not apply to infringement, in your "advertisement", of:

**(1)** Copyright;

**(2)** Slogan, unless the slogan is also a trademark, trade name, service mark or other designation of origin or authenticity; or

**(3)** Title of any literary or artistic work.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **17.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, placing an "advertisement" for or linking to others on your web site, by itself, is not considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatags, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

o. **War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

p. **Internet Advertisements And Content Of Others**

"Personal and advertising injury" arising out of:

(1) An "advertisement" for others on your web site;

(2) Placing a link to a web site of others on your web site;

(3) Content, including information, sounds, text, graphics, or images from a web site of others displayed within a frame or border on your web site; or

(4) Computer code, software or programming used to enable:

(a) Your web site; or

(b) The presentation or functionality of an "advertisement" or other content on your web site.

q. **Right Of Privacy Created By Statute**

"Personal and advertising injury" arising out of the violation of a person's right of privacy created by any state or federal act.

However, this exclusion does not apply to liability for damages that the insured would have in the absence of such state or federal act.

r. **Violation Of Anti-Trust law**

"Personal and advertising injury" arising out of a violation of any anti-trust law.

s. **Securities**

"Personal and advertising injury" arising out of the fluctuation in price or value of any stocks, bonds or other securities.

t. **Discrimination Or Humiliation**

"Personal and advertising injury" arising out of discrimination or humiliation committed by or at the direction of any "executive officer", director, stockholder, partner or member of the insured.

u. **Employment-Related Practices**

"Personal and advertising injury" to:

(1) A person arising out of any "employment-related practices"; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any "employment-related practices" are directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

v. **Asbestos**

(1) "Personal and advertising injury" arising out of the "asbestos hazard".

(2) Any damages, judgments, settlements, loss, costs or expenses that:

(a) May be awarded or incurred by reason of any claim or suit alleging actual or threatened injury or damage of any nature or kind to persons or property which would not have occurred in whole or in part but for the "asbestos hazard";

(b) Arise out of any request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, encapsulate, contain, treat, detoxify or neutralize or in any way respond to or assess the effects of an "asbestos hazard"; or

(c) Arise out of any claim or suit for damages because of testing for, monitoring, cleaning up, removing, encapsulating, containing, treating, detoxifying or neutralizing or in any way responding to or assessing the effects of an "asbestos hazard".

## COVERAGE C MEDICAL PAYMENTS

1. **Insuring Agreement**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within three years of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

EXH 1 – 14

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

2. **Exclusions**

We will not pay expenses for "bodily injury":

a. **Any Insured**

To any insured, except "volunteer workers".

b. **Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. **Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

d. **Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. **Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

f. **Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

g. **Coverage A Exclusions**

Excluded under Coverage A.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $1,000 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of appeal bonds or bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $500 a day because of time off from work.

e. All costs taxed against the insured in the "suit".

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee,

necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section I – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

  **a.** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

  **b.** The conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

  **a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

  **b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

  **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

  **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

  **e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

  **a. Employees and Volunteer workers**

    Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

However, none of these "employees" or "volunteer workers" are insureds for:

  **(1)** "Bodily injury" or "personal and advertising injury":

    **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

    **(b)** To the spouse, child, parent, brother or sister of that co-"employee" or that "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

    **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

    **(d)** Arising out of his or her providing or failing to provide professional health care services.

    If you are not in the business of providing professional health care services, Paragraph **(d)** does not apply to any nurse, emergency medical technician or paramedic employed by you to provide such services.

  **(2)** "Property damage" to property:

    **(a)** Owned, occupied or used by,

    **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

    you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

  **b. Real Estate Manager**

    Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

  **c. Temporary Custodians of Your Property**

    Any person or organization having proper temporary custody of your property if you die, but only:

    **(1)** With respect to liability arising out of the maintenance or use of that property; and

    **(2)** Until your legal representative has been appointed.

  **d. Legal Representative If You Die**

    Your legal representative if you die, but only with respect to duties as such. That representative will

03960

*0500221OV61680101*

have all your rights and duties under this Coverage Part.

**e. Unnamed Subsidiary**

Any subsidiary, and subsidiary thereof, of yours which is a legally incorporated entity of which you own a financial interest of more than 50% of the voting stock on the effective date of the Coverage Part.

The insurance afforded herein for any subsidiary not named in this Coverage Part as a named insured does not apply to injury or damage with respect to which an insured under this Coverage Part is also an insured under another policy or would be an insured under such policy but for its termination or the exhaustion of its limits of insurance.

**3. Newly Acquired or Formed Organization**

Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain financial interest of more than 50% of the voting stock, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

**4. Mobile Equipment**

With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

**a.** "Bodily injury" to a co-"employee" of the person driving the equipment; or

**b.** "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

**5. Nonowned Watercraft**

With respect to watercraft you do not own that is less than 51 feet long and is not being used to carry persons for a charge, any person is an insured while operating such watercraft with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the watercraft, and only if no other insurance of any kind is available to that person or organization for this liability.

However, no person or organization is an insured with respect to:

**a.** "Bodily injury" to a co-"employee" of the person operating the watercraft; or

**b.** "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

**6. Additional Insureds When Required By Written Contract, Written Agreement Or Permit**

The following person(s) or organization(s) are an additional insured when you have agreed, in a written contract, written agreement or because of a permit issued by a state or political subdivision, that such person or organization be added as an additional insured on your policy, provided the injury or damage occurs subsequent to the execution of the contract or agreement.

A person or organization is an additional insured under this provision only for that period of time required by the contract or agreement.

However, no such person or organization is an insured under this provision if such person or organization is included as an insured by an endorsement issued by us and made a part of this Coverage Part.

**a. Vendors**

Any person(s) or organization(s) (referred to below as vendor), but only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business and only if this Coverage Part provides coverage for "bodily injury" or "property damage" included within the "products-completed operations hazard".

**(1)** The insurance afforded the vendor is subject to the following additional exclusions:

This insurance does not apply to:

**(a)** "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

(b) Any express warranty unauthorized by you;

(c) Any physical or chemical change in the product made intentionally by the vendor;

(d) Repackaging, except when unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

(e) Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

(f) Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

(g) Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or

(h) "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf. However, this exclusion does not apply to:

(i) The exceptions contained in Sub-paragraphs (d) or (f); or

(ii) Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

(2) This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

b. **Lessors of Equipment**

(1) Any person or organization from whom you lease equipment; but only with respect to their liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person or organization.

(2) With respect to the insurance afforded to these additional insureds this insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

c. **Lessors of Land or Premises**

Any person or organization from whom you lease land or premises, but only with respect to liability arising out of the ownership, maintenance or use of that part of the land or premises leased to you.

With respect to the insurance afforded these additional insureds the following additional exclusions apply:

This insurance does not apply to:

1. Any "occurrence" which takes place after you cease to lease that land; or

2. Structural alterations, new construction or demolition operations performed by or on behalf of such person or organization.

d. **Architects, Engineers or Surveyors**

Any architect, engineer, or surveyor, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

(1) In connection with your premises; or

(2) In the performance of your ongoing operations performed by you or on your behalf.

With respect to the insurance afforded these additional insureds, the following additional exclusion applies:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or the failure to render any professional services by or for you, including:

1. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

2. Supervisory, inspection, architectural or engineering activities.

e. **Permits Issued By State Or Political Subdivisions**

Any state or political subdivision, but only with respect to operations performed by you or on your behalf for which the state or political subdivision has issued a permit.

With respect to the insurance afforded these additional insureds, this insurance does not apply to:

(1) "Bodily injury", "property damage" or "personal and advertising injury" arising out of operations performed for the state or municipality; or

(2) "Bodily injury" or "property damage" included within the "products-completed operations hazard".

03961

*0500221UV61680101*

HG 00 01 06 05

**f. Any Other Party**

Any other person or organization who is not an insured under Paragraphs a. through e. above, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

(1) In the performance of your ongoing operations;

(2) In connection with your premises owned by or rented to you; or

(3) In connection with "your work" and included within the "products-completed operations hazard", but only if

(a) The written contract or agreement requires you to provide such coverage to such additional insured; and

(b) This Coverage Part provides coverage for "bodily injury" or "property damage" included within the "products-completed operations hazard".

With respect to the insurance afforded to these additional insureds, this insurance does not apply to:

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of, or the failure to render, any professional architectural, engineering or surveying services, including:

(1) The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(2) Supervisory, inspection, architectural or engineering activities.

The limits of insurance that apply to additional insureds under this provision is described in Section III – Limits Of Insurance.

How this insurance applies when other insurance is available to the additional insured is described in the Other Insurance Condition in Section IV – Commercial General Liability Conditions.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1. The Most We will Pay**

The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

**2. General Aggregate Limit**

The General Aggregate Limit is the most we will pay for the sum of:

a. Medical expenses under Coverage **C**;

b. Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

c. Damages under Coverage **B**.

**3. Products-Completed Operations Aggregate Limit**

The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4. Personal and Advertising Injury Limit**

Subject to **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5. Each Occurrence Limit**

Subject to **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

a. Damages under Coverage **A**; and

b. Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6. Damage To Premises Rented To You Limit**

Subject to **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, lightning or explosion, while rented to you or temporarily occupied by you with permission of the owner.

In the case of damage by fire, lightning or explosion, the Damage to Premises Rented To You Limit applies to all damage proximately caused by the same event, whether such damage results from fire, lightning or explosion or any combination of these.

**7. Medical Expense Limit**

Subject to **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

**8. How Limits Apply To Additional Insureds**

If you have agreed in a written contract or written agreement that another person or organization be

added as an additional insured on your policy, the most we will pay on behalf of such additional insured is the lesser of:

**a.** The limits of insurance specified in the written contract or written agreement; or

**b.** The Limits of Insurance shown in the Declarations.

Such amount shall be a part of and not in addition to Limits of Insurance shown in the Declarations and described in this Section.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV — COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a. Notice Of Occurrence Or Offense**

You or any additional insured must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b. Notice Of Claim**

If a claim is made or "suit" is brought against any insured, you or any additional insured must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You or any additional insured must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c. Assistance And Cooperation Of The Insured**

You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d. Obligations At The Insureds Own Cost**

No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**e. Additional Insureds Other Insurance**

If we cover a claim or "suit" under this Coverage Part that may also be covered by other insurance available to an additional insured, such additional insured must submit such claim or "suit" to the other insurer for defense and indemnity.

However, this provision does not apply to the extent that you have agreed in a written contract or written agreement that this insurance is primary and non-contributory with the additional insured's own insurance.

**f. Knowledge Of An Occurrence, Offense, Claim Or Suit**

Paragraphs **a.** and **b.** apply to you or to any additional insured only when such "occurrence", offense, claim or "suit" is known to:

**(1)** You or any additional insured that is an individual;

**(2)** Any partner, if you or an additional insured is a partnership;

**(3)** Any manager, if you or an additional insured is a limited liability company;

**(4)** Any "executive officer" or insurance manager, if you or an additional insured is a corporation;

**(5)** Any trustee, if you or an additional insured is a trust; or

**(6)** Any elected or appointed official, if you or an additional insured is a political subdivision or public entity.

This duty applies separately to you and any additional insured.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or

03962

*0500221UV61680101

that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when **b.** below applies. If other insurance is also primary, we will share with all that other insurance by the method described in **c.** below.

**b. Excess Insurance**

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

**(1) Your Work**

That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(2) Premises Rented To You**

That is fire, lightning or explosion insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(3) Tenant Liability**

That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner;

**(4) Aircraft, Auto Or Watercraft**

If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability;

**(5) Property Damage to Borrowed Equipment Or Use Of Elevators**

If the loss arises out of "property damage" to borrowed equipment or the use of elevators to the extent not subject to Exclusion **j.** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability;

**(6) When You Are Added As An Additional Insured To Other Insurance**

Any other insurance available to you covering liability for damages arising out of the premises or operations, or products and completed operations, for which you have been added as an additional insured by that insurance; or

**(7) When You Add Others As An Additional Insured To This Insurance**

Any other insurance available to an additional insured.

However, the following provisions apply to other insurance available to any person or organization who is an additional insured under this coverage part.

**(a) Primary Insurance When Required By Contract**

This insurance is primary if you have agreed in a written contract or written agreement that this insurance be primary. If other insurance is also primary, we will share with all that other insurance by the method described in **c.** below.

**(b) Primary And Non-Contributory To Other Insurance When Required By Contract**

If you have agreed in a written contract, written agreement, or permit that this insurance is primary and non-contributory with the additional insured's own insurance, this insurance is primary and we will not seek contribution from that other insurance.

Paragraphs **(a)** and **(b)** do not apply to other insurance to which the additional insured has been added as an additional insured.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

a. **When You Accept This Policy**

By accepting this policy, you agree:

(1) The statements in the Declarations are accurate and complete;

(2) Those statements are based upon representations you made to us; and

(3) We have issued this policy in reliance upon your representations.

b. **Unintentional Failure To Disclose Hazards**

If unintentionally you should fail to disclose all hazards relating to the conduct of your business that exist at the inception date of this Coverage Part, we shall not deny coverage under this Coverage Part because of such failure.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

a. **Transfer of Rights Of Recovery**

If the insured has rights to recover all or part of any payment, including Supplementary Payments, we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the

insured will bring "suit" or transfer those rights to us and help us enforce them.

b. **Waiver Of Rights Of Recovery (Waiver Of Subrogation)**

If the insured has waived any rights of recovery against any person or organization for all or part of any payment, including Supplementary Payments, we have made under this Coverage Part, we also waive that right, provided the insured waived their rights of recovery against such person or organization in a contract, agreement or permit that was executed prior to the injury or damage.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Advertisement" means the widespread public dissemination of information or images that has the purpose of inducing the sale of goods, products or services through:

a. (1) Radio;

(2) Television;

(3) Billboard;

(4) Magazine;

(5) Newspaper; or

b. Any other publication that is given widespread public distribution.

However, "advertisement" does not include:

a. The design, printed material, information or images contained in, on or upon the packaging or labeling of any goods or products; or

b. An interactive conversation between or among persons through a computer network.

2. "Advertising idea" means any idea for an "advertisement".

3. "Asbestos hazard" means an exposure or threat of exposure to the actual or alleged properties of asbestos and includes the mere presence of asbestos in any form.

4. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

5. "Bodily injury" means physical:

a. Injury;

b. Sickness; or

c. Disease

sustained by a person and, if arising out of the above, mental anguish or death at any time.

03963

*0500221UV61680101*

EXH 1 – 22

6. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in **a.** above; or

   c. All other parts of the world if the injury or damage arises out of:

     (1) Goods or products made or sold by you in the territory described in **a.** above;

     (2) The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; or

     (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

provided the insured's responsibility to pay damages is determined in the United States of America (including its territories and possessions), Puerto Rico or Canada, in a "suit" on the merits according to the substantive law in such territory or in a settlement we agree to.

7. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

8. "Employment-Related Practices" means:

   a. Refusal to employ a person;

   b. Termination of a person's employment; or

   c. Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at a person.

9. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

10. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

11. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

   b. Your fulfilling the terms of the contract or agreement.

12. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire, lightning or explosion to premises while rented to you or temporarily occupied by you with permission of the owner is subject to the Damage to Premises Rented To You Limit described in Section III – Limits of Insurance;

   b. A sidetrack agreement;

   c. Any easement or license agreement, including an easement or license agreement in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** includes that part of any contract or agreement that indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing.

However, Paragraph **f.** does not include that part of any contract or agreement:

   (1) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

     (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

     (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

   (2) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(1)** above and supervisory, inspection, architectural or engineering activities.

13. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

14. "Loading or unloading" means the handling of property:

   a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

HG 00 01 06 05

EXH 1 – 23

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

15. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment, of at least 1,000 pounds gross vehicle weight, designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing;

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

16. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

17. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral, written or electronic publication of material that violates a person's right of privacy;

f. Copying, in your "advertisement", a person's or organization's "advertising idea" or style of "advertisement";

g. Infringement of copyright, slogan, or title of any literary or artistic work, in your "advertisement"; or

h. Discrimination or humiliation that results in injury to the feelings or reputation of a natural person.

18. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

19. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

03964

*05002210V61680101*

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

20. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

As used in this definition, computerized or electronically stored data, programs or software are not tangible property. Electronic data means information, facts or programs:

a. Stored as or on;

b. Created or used on; or

c. Transmitted to or from;

computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

21. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

22. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

23. "Volunteer worker" means a person who

a. Is not your "employee";

b. Donates his or her work;

c. Acts at the direction of and within the scope of duties determined by you; and

d. Is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

24. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

25. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

(2) The providing of or failure to provide warnings or instructions.

HG 00 01 06 05

EXH 1 – 25

**POLICY NUMBER:** 21 UUN UV6168



## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

WAIVER OF TRANSFER RIGHTS OF RECOVERY AGAINST
OTHERS CG2404

COMMERCIAL GENERAL LIABILITY COVERAGE PART

AHOLD USA COMPANIES, INC.
MAC RISK MANAGEMENT, INC.
P.O. BOX 9227
BOSTON, MA  02209

Form IH 12 01 11 85  SEQ.NO. 01   Printed in U.S.A.

**POLICY NUMBER:** 21 UUN UV6168



## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

ABSOLUTE POLLUTION EXCLUSION EXCEPTION FOR
DESIGNATED PRODUCTS OR COMPLETED OPERATIONS
FORM CG2133

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

DESCRIPTION OF:

A. PRODUCTS
   ALL PRODUCTS CONTAINING ALPHA AND/OR BETA HYDROXY ACIDS.

B. COMPLETED OPERATIONS

   SUBPARAGRAPH F (1)(E) OF THE ABSOLUTE POLLUTION EXCLUSION
   (FORM HC2131) DOES NOT APPLY TO PRODUCTS OR COMPLETED OPERATIONS
   DESCRIBED IN THE SCHEDULE ABOVE.

**Form IH 12 01 11 85  SEQ.NO.  02     Printed in U.S.A.**

COMMERCIAL GENERAL LIABILITY
CG 02 20 12 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FLORIDA CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
ELECTRONIC DATA LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

**2. Cancellation Of Policies In Effect**

**a. For 90 Days Or Less**

If this policy has been in effect for 90 days or less, we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation, accompanied by the reasons for cancellation, at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**(2)** 20 days before the effective date of cancellation if we cancel for any other reason, except we may cancel immediately if there has been:

**(a)** A material misstatement or misrepresentation; or

**(b)** A failure to comply with the underwriting requirements established by the insurer.

**b. For More Than 90 Days**

If this policy has been in effect for more than 90 days, we may cancel this policy only for one or more of the following reasons:

**(1)** Nonpayment of premium;

**(2)** The policy was obtained by a material misstatement;

**(3)** Failure to comply with underwriting requirements established by the insurer within 90 days of the effective date of coverage;

**(4)** A substantial change in the risk covered by the policy; or

**(5)** The cancellation is for all insureds under such policies for a given class of insureds.

If we cancel this policy for any of these reasons, we will mail or deliver to the first Named Insured written notice of cancellation, accompanied by the reasons for cancellation, at least:

**(a)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**(b)** 45 days before the effective date of cancellation if we cancel for any of the other reasons stated in Paragraph **2.b.**

**B.** Paragraph **5.** of the **Cancellation** Common Policy Condition is replaced by the following:

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will mail the refund within 15 working days after the date cancellation takes effect, unless this is an audit policy.

© ISO Properties, Inc., 2007

EXH 1 – 28

If this is an audit policy, then, subject to your full cooperation with us or our agent in securing the necessary data for audit, we will return any premium refund due within 90 days of the date cancellation takes effect. If our audit is not completed within this time limitation, then we shall accept your own audit, and any premium refund due shall be mailed within 10 working days of receipt of your audit.

The cancellation will be effective even if we have not made or offered a refund.

**C.** The following is added and supersedes any other provision to the contrary:

**NONRENEWAL**

1. If we decide not to renew this policy we will mail or deliver to the first Named Insured written notice of nonrenewal, accompanied by the reason for nonrenewal, at least 45 days prior to the expiration of this policy.

2. Any notice of nonrenewal will be mailed or delivered to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

© ISO Properties, Inc., 2007

CG 02 20 12 07

EXH 1 – 29

**POLICY NUMBER:** 21 UUN UV6168

COMMERCIAL GENERAL LIABILITY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION - DESIGNATED PRODUCTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

SCHEDULE

**Designated Product(s):**

SEE IH1201

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance does not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of any of "your products" shown in the Schedule.

CG 21 33 11 85          Copyright, Insurance Services Office, Inc., 1984

EXH 1 – 30

**POLICY NUMBER:** 21 UUN UV6168

COMMERCIAL GENERAL LIABILITY
CG 24 04 10 93

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

**Name of Person or Organization:**

SEE IH 1201

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US Condition (Section IV - COMMERCIAL GENERAL LIABILITY CONDITIONS) is amended by the addition of the following:

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard" This waiver applies only to the person or organization shown in the Schedule above.

**CG 24 04 10 93**           Copyright, Insurance Services Office, Inc., 1992



**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – FUNGI, BACTERIA AND VIRUSES

This endorsement modifies insurance provided under the following:



COMMERCIAL GENERAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE FORM
MANUFACTURERS' ERRORS AND OMISSIONS LIABILITY COVERAGE PART
COUNSELING PROFESSIONAL ERRORS AND OMISSIONS LIABILITY COVERAGE FORM
EDUCATORS LEGAL LIABILITY COVERAGE FORM
CONDOMINIUM AND COOPERATIVE DIRECTORS AND OFFICERS LIABILITY COVERAGE FORM
PRODUCT RECALL EXPENSE COVERAGE FORM

This insurance does not apply to:

1.  Injury or damage arising out of or related to the presence of, suspected presence of, or exposure to:

    a.  Fungi, including but not limited to mold, mildew, and yeast;

    b.  Bacteria;

    c.  Viruses; or

    d.  Dust, spores, odors, particulates or byproducts, including but not limited to mycotoxins and endotoxins, resulting from any of the organisms listed in a., b., or c. above;

    from any source whatsoever.

2.  Any loss, cost or expense arising out of the testing for, monitoring of, cleaning up of, removal of, containment of, treatment of, detoxification of, neutralization of, remediation of, disposal of, or any other response to or assessment of, the effects of any of the items in 1.a., b., c. or d. above, from any source whatsoever.

However, this exclusion does not apply to "bodily injury" or "property damage" caused by the ingestion of food.

**Form HC 21 90 09 01**

© 2000, The Hartford

**Page 1 of 1**



**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONDOMINIUM AND COOPERATIVE DIRECTORS AND OFFICERS LIABILITY COVERAGE FORM
EDUCATORS LEGAL LIABILITY COVERAGE FORM
EMPLOYEE BENEFITS LIABILITY COVERAGE FORM
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
LIBRARY ERRORS AND OMISSIONS LIABILITY COVERAGE FORM
LIQUOR LIABILITY COVERAGE PART
MANUFACTURERS' ERRORS AND OMISSIONS LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRINTER'S ERRORS AND OMISSIONS LIABILITY COVERAGE FORM
PRODUCT RECALL EXPENSE COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY NEW YORK DEPARTMENT OF TRANSPORTATION

**A.** A "Certified act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism. The criteria contained in the federal Terrorism Risk Insurance Act, as amended (TRIA), for a "certified act of terrorism" includes the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to TRIA; and

**2.** The act resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and

**3.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** If aggregate insured losses attributable to terrorist acts certified under TRIA exceeds $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under TRIA, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion and, in such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**C.** The United States Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of such insured losses that exceeds the applicable insurer deductible. However, if aggregate insured losses attributable to certified terrorist acts exceed $100 billion in a Program Year (January 1 through December 31) the Treasury will not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**D.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the War Exclusion.

Form HC 23 70 01 08

Page 1 of 1

© 2008, The Hartford
(Includes copyrighted material of Insurance Services Office, Inc., with its permission.)

EXH 1 – 33

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - SILICA

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> CONDOMINIUM AND COOPERATIVE DIRECTORS AND OFFICERS LIABILITY COVERAGE FORM
> EDUCATORS LEGAL LIABILITY COVERAGE FORM
> EMPLOYERS LIABILITY AND STOP GAP COVERAGE FORM
> ERRORS AND OMISSIONS LIABILITY COVERAGE FORM
> MANUFACTURERS' ERRORS AND OMISSIONS LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART
> SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY - NEW YORK DEPARTMENT OF TRANSPORTATION

**A.**  The following exclusion is added:

This insurance does not apply to:

**Silica**

Any injury, damage, loss, cost or expense, including but not limited to "bodily injury", "property damage" or "personal and advertising injury" arising out of, or relating to, in whole or in part, the "silica hazard".

**B.**  The following is added to the **Definitions** Section:

"Silica hazard" means an exposure to, inhalation of or contact with, or threat of exposure to, inhalation of or contact with, the actual or alleged properties of silica or any silica containing materials and includes the mere presence of silica or any silica containing materials in any form.

Silica includes all forms of the compound silicon dioxide, including but not limited to quartz.

**HG 21 02 02 04**

© 2004, The Hartford

Page 1 of 1

# EXHIBIT 2



1  LEXINGTON LAW GROUP
2  Mark N. Todzo (State Bar No. 168389)
   Howard Hirsch (State Bar No. 213209)
   Lisa Burger (State Bar No. 239676)
3  503 Divisadero Street
   San Francisco, CA 94117
4  Telephone: (415) 913-7800
   Facsimile: (415) 759-4112
5  mtodzo@lexlawgroup.com

6  Attorneys for Plaintiffs
   ANDREA GOLLOHER, MARISA FREEMAN,
7  ROBERTA CHASE MICHAEL SHAPIRO and
   BRENDA BROWN

8

9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                         COUNTY OF ALAMEDA

12

13  ANDREA GOLLOHER, MARISA FREEMAN,        Case No.
    ROBERTA CHASE, MICHAEL SHAPIRO and
14  BRENDA BROWN on behalf of themselves and
15  all others similarly situated,
                                            CLASS ACTION
16                          Plaintiffs,     COMPLAINT

17          vs.

18  TODD CHRISTOPHER INTERNATIONAL,
19  INC. DBA VOGUE INTERNATIONAL, a
    Florida Corporation, and DOES 1-100,
20
                            Defendants.
21

22

23

24

25

26

27

28

**ENDORSED
FILED
ALAMEDA COUNTY**

**OCT 25 2012**

**CLERK OF THE SUPERIOR COURT
by_____Kimel-Phillips_____**

**RG12 093691**

COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

**PLAINTIFF'S
EXHIBIT
2**

ALL-STATE LEGAL®

1    Plaintiffs Andrea Golloher, Marisa Freeman, Roberta Chase, Michael Shapiro and
2  Brenda Brown ("Plaintiffs"), on behalf of themselves and those similarly situated based on
3  information and belief and investigation of counsel, except for information based on personal
4  knowledge, hereby allege:

5                                        **INTRODUCTION**

6    1.    This Complaint seeks to remedy the unlawful, unfair and deceptive business
7  practices of defendant Todd Christopher International, Inc. dba Vogue International ("Defendant"
8  or "Vogue") with respect to its cosmetic products (also referred to as personal care products) sold
9  under the Organix brand name (the "Products"). The Products are advertised, marketed, labeled,
10 sold and represented as organic, but are composed almost entirely from ingredients that are not
11 organic. All of the Organix Products are prominently marketed and labeled as "Organix," a name
12 which was chosen to look and sound like the word "organics" in order to represent that the
13 Products are organic. In addition, Defendant's marketing materials for the Organix Products are
14 littered with statements that represent the Products as organic, and the front and back labels of
15 some of the Products state that the Products contain organic ingredients. Plaintiffs and the Classes
16 reasonably believed Defendant's representations that the Products are organic, and would not have
17 purchased the Products or paid such a high price for the Products but for Defendant's false and
18 misleading identification of the Products as organic.

19    2.    Organic products are made with organically grown plants. As such, organic
20 ingredients are produced without the use of pesticides and other harmful or potentially harmful
21 chemicals. Organic products have gained popularity such that over 70% of households in the
22 United States now use some organic products each year, even though such products typically cost
23 more than their non-organic counterparts. Growing concerns over the use of harmful chemicals in
24 the production of non-organic products, together with a desire for more healthy lifestyles, have
25 spurred the popularity of organic products. One of the fastest growing markets for organic
26 products is that of organic personal care products. Consumers such as Plaintiffs and the other
27 members of the Classes are willing to pay more for organic personal care products such as skin
28 care, hair care and body care in order to avoid harmful chemicals in favor of more natural

-1-
COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

1   ingredients. Defendant takes advantage of this segment of consumers by marketing, advertising,

2   selling, labeling and representing the Products as organic, when in fact such Products contain

3   significant amounts of non-organic ingredients. In fact, the vast majority of the ingredients in the

4   Products are not organic.

5        3.    Defendant's conduct of advertising, marketing, selling, labeling and representing

6   the Products as organic, when in fact such Products are composed mainly of non-organic

7   ingredients, constitutes unlawful, unfair and deceptive conduct, is likely to deceive members of the

8   public, is unethical, oppressive, unscrupulous and/or substantially injurious to consumers, and

9   violates legislatively declared policies against misrepresenting the characteristics of goods and

10   services. As such, Defendant's marketing, labeling and advertising practices violate California's

11   Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* (hereinafter the "UCL") and

12   Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* (hereinafter the "CLRA"), New

13   York's General Business Law § 349, Hawaii's Revised Statutes § 480-2, Washington's Consumer

14   Protection Act, Revised Code Washington § 19.86.010, *et seq.* (hereinafter the "WCPA"), and

15   breach the express warranties regarding the Products. Accordingly, pursuant to California

16   Business & Professions Code § 17203, Plaintiffs seek an order enjoining Defendant's acts of

17   unfair competition and awarding restitution to the individual victims in California of Defendant's

18   unfair and deceptive practices. In addition, Plaintiffs and the Warranty Class of similarly situated

19   individuals on whose behalf Plaintiffs bring this action seek damages for Defendant's breach of

20   express warranties concerning the organic nature of the Products sold in California, New York,

21   Hawaii, Florida, New Jersey, Ohio, Washington and Texas. The California Plaintiffs seek

22   damages under the CLRA on behalf of themselves and the Class. Plaintiff Chase further seeks

23   injunctive relief and damages on behalf of herself and the class of purchasers of the Products in

24   New York. Plaintiff Shapiro seeks injunctive relief and damages on behalf of the Hawaii Class

25   and Plaintiff Brown seeks injunctive relief and damages on behalf of the Washington Class.

26        4.    California law expressly prohibits companies such as Defendant from engaging in

27   this type of misleading labeling. The California Organic Products Act of 2003, Cal. Health &

28   Safety Code § 110810, *et seq.* (hereinafter "COPA"), requires that any cosmetic product sold,

COMPLAINT - GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

1  labeled and/or represented as "organic" must be composed of at least 70% organically produced

2  ingredients by weight or fluid volume, excluding water and salt.  The Products are cosmetics that

3  contain far less than 70% organically produced ingredients, excluding water and salt.

4  Nevertheless, Defendant labels, sells and represents the Products as organic.

5  **PARTIES**

6       5.     Plaintiff Andrea Golloher is a resident of California who purchased one or more of

7  the Products.  On or about April 2011, Plaintiff Golloher purchased one of the Products at a retail

8  store in San Jose, California.  The front label of the Product, which Plaintiff Golloher reviewed

9  prior to purchase, prominently displays the word "Organix."  The front label of the Product also

10  represented that the Product is made with "organic" ingredients.  At the time of purchase, Plaintiff

11  Golloher reasonably believed that the Product was either completely or at least mostly organic.

12  Had Plaintiff Golloher known that the Product was made primarily from non-organic ingredients,

13  Plaintiff would not have bought the Product at all, or would not have paid more for the Product

14  than the cost of other non-organic hair products.

15       6.     Plaintiff Marisa Freeman is a resident of California who purchased one or more of

16  the Products.  On or about November 2010, Plaintiff Freeman purchased two of the Products at a

17  retail store in San Francisco, California.  The front label of both Products, which Plaintiff Freeman

18  reviewed prior to purchase, prominently displays the word "Organix."  In addition, the front label

19  of both Products represented that the Products are made with "organic" ingredients.  At the time of

20  purchase, Plaintiff Freeman reasonably believed that both Products were either completely or at

21  least mostly organic.  Had Plaintiff Freeman known that the Products were made primarily from

22  non-organic ingredients, Plaintiff Freeman would not have bought the Products at all, or would not

23  have paid more for the Products than the cost of other non-organic hair products.  Together,

24  Plaintiffs Golloher and Freeman are referred to herein as the "California Plaintiffs."

25       7.     Plaintiff Roberta Chase is a resident of New York who purchased one or more of

26  the Products.  On or about July 2010, Plaintiff Chase purchased two of the Products in Cobleskill,

27  New York.  The front label of both products, which Plaintiff Chase reviewed prior to purchase,

28  prominently displays the word "Organix."  The front label of both Products also represented that

-3-
COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

EXH 2 – 4

1   the Products are made with "organic" ingredients. At the time of purchase, Plaintiff Chase

2   reasonably believed that both Products were either completely or at least mostly organic. Had

3   Plaintiff Chase known that the Products were made primarily from non-organic ingredients,

4   Plaintiff Chase would not have bought the Products at all, or would not have paid more for the

5   Products than the cost of other non-organic hair products.

6         8.    Plaintiff Michael Shapiro is a resident of Hawaii who purchased one or more of the

7   Organix Products. During the period from on or about February 2008 up through February 2009,

8   Plaintiff Shapiro regularly purchased two of the Products at retail stores in Haleiwa, Hawaii. The

9   front labels of both Products, which Plaintiff Shapiro reviewed prior to purchase, prominently

10  display the word "Organix." The Products' back labels also stated that the Products contain

11  "organic" ingredients. At the time of his purchases, Plaintiff Shapiro reasonably believed that

12  both Products were either completely or at least mostly organic. Had Plaintiff Shapiro known that

13  the Products were made primarily from non-organic ingredients, he would not have bought the

14  Products at all, or would not have paid more for the Products than the cost of other non-organic

15  hair products.

16        9.    Plaintiff Brenda Brown is a resident of the state of Washington who purchased one

17  or more of the Organix Products. During the period from on or about January 2010 up through

18  June 2012, Plaintiff Brown regularly purchased four of the Products at retail stores in Lacey,

19  Washington. The front label of the Products, which Plaintiff Brown reviewed prior to purchase,

20  prominently displays the word "Organix." The front label of the Products purchased also

21  represented that the Products are made with "organic" ingredients. At the time of purchase,

22  Plaintiff Brown reasonably believed that both Products were either completely or at least mostly

23  organic. Had Plaintiff Brown known that the Products were made primarily from non-organic

24  ingredients, Plaintiff Brown would not have bought the Products at all, or would not have paid

25  more for the Products than the cost of other non-organic hair products.

26       10.    Defendant Todd Christopher International, Inc. dba Vogue International is a

27  Florida corporation with its principal place of business in Oldsmar, Florida. Defendant advertises,

28  markets, distributes and sells the Products in California, New York, Florida, New Jersey, Ohio,

1  Washington, Texas and Hawaii.

2  11.  DOES 1 through 100 are persons or entities whose true names and capacities are

3  presently unknown to Plaintiffs, and who therefore are sued by such fictitious names.  Plaintiffs

4  are informed and believe, and on that basis allege, that each of the fictitiously named defendants

5  perpetrated some or all of the wrongful acts alleged herein and are responsible in some manner for

6  the matters alleged herein.  Plaintiffs will amend this Complaint to state the true names and

7  capacities of such fictitiously named defendants when ascertained.

8  12.  Defendant Todd Christopher International, Inc. dba Vogue International and DOES

9  1-100 are collectively referred to herein as "Defendants."

10  **JURISDICTION AND VENUE**

11  13.  This Court has jurisdiction over all causes of action asserted herein pursuant to the

12  California Constitution, Article VI, Section 10, because this case is a cause not given by statute to

13  other trial courts.  This Court also has jurisdiction over certain causes of action asserted herein

14  pursuant to Business & Professions Code §§ 17203 and 17204, which allow enforcement in any

15  Court of competent jurisdiction.

16  14.  This Court has jurisdiction over Defendants because each is a corporation or other

17  entity that has sufficient minimum contacts in California, is a citizen of California, or otherwise

18  intentionally avails itself of the California market either through the distribution, sale and/or

19  marketing of the Products in the State of California or by having a facility located in California so

20  as to render the exercise of jurisdiction over it by the California courts consistent with traditional

21  notions of fair play and substantial justice.

22  15.  Venue in the County of Alameda is proper under California Civil Code § 111910,

23  Business & Professions Code § 17203, Code of Civil Procedure §§ 395 and 395.5, and Civil Code

24  § 1780, because this Court is a court of competent jurisdiction and the Products are sold

25  throughout this County.  Concurrently with filing this Complaint, Plaintiffs are filing an affidavit

26  pursuant to Civil Code § 1780(d) regarding the propriety of venue in Alameda County.

27  **BACKGROUND FACTS**

28  16.  In 2006, Defendants introduced their "Organix" line of Products.  Although the

-5-
COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

1  Products contain very small quantities of organic ingredients, Defendants selected a brand name
2  that looks nearly identical to, and sounds identical to, the word "organics," in order to exploit the
3  growing consumer demand for organic products.  To ensure that consumers made the association
4  between "Organix" and "organics," Defendants also emblazoned the word "organic" on the front
5  label of the Products in bold type and littered their advertising materials with references to the
6  Products' allegedly organic properties.  Nevertheless, the Products are largely composed of
7  ingredients which Defendants admit are not organic.

8       17.     Defendants' scheme to exploit consumer demand for organic products by falsely
9  advertising the Products as organic has been extraordinarily successful.  Since the brand's
10  inception, annual dollar sales of the Products have increased from almost $9 million in 2007, to
11  over $30 million in 2008, to over $40 million in 2009, to over $50 million in 2010, to over $60
12  million through the first half of 2011 (the last time period for which sales figures are publicly
13  available).

14       18.     In or about May 2007, Vogue submitted its initial application to the United States
15  Patent and Trademark Office ("USPTO") to register the Organix trade name for use on personal
16  care products.  In or about March 2008, the USPTO rejected this application on the grounds that
17  Vogue had **not** limited the description of goods to personal care products "comprised of primarily
18  organic ingredients" (emphasis in original).

19       19.     In or about October 2008, Vogue submitted another application to the USPTO, and
20  yet again failed to limit the description of goods to organic personal care products.  The USPTO's
21  initial response was to reject the application again, finding that, "If applicant uses, or intends to
22  use, the mark on goods other than those that are organic, such use would be deceptive . . . .
23  Therefore, applicant must amend the identification by limiting it to organic goods."  In response,
24  Vogue amended its application to limit use of the trademark Organix on "organic" personal care
25  products, which USPTO ultimately approved.  Although Vogue changed the description of its
26  goods to secure USPTO approval of the trademark, Defendants did not change the formulation of
27  the Products.  In fact, the Products all contain less than 10 percent organic ingredients – in most
28  instances, far less.

-6-

EXH 2 – 7

20.     Defendants advertise, market, label, sell and represent the Products as organic. In recognition of the fact that consumers will pay more for organic products, Defendants prominently display the word "Organix" on the front label of every Product.  Defendants advertise the Products within the Organix line as organic by use of the Organix brand name and by inclusion of the word "organic" on the Products' front and/or back labels and in Product advertising.

21.     While the Products are marketed in various blends (or "flavors" – *e.g.*, "Coconut Milk"), Defendants utilize uniform containers, packaging and marketing materials for the Products.  For instance, the Products all contain the word "Organix" emblazoned on the front of the packaging in the same location, coloring and font.

22.     The Products are all intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to, the human body, or any part of the human body, for cleansing, beautifying, promoting attractiveness, or altering the appearance, and are thus "cosmetics" under California law.  Health & Safety Code § 109900.

23.     While prominently displaying the word "Organix" on the front label of every Product, Defendants also include an ingredient list in small print on the back label of each Product.  The list of ingredients is in a substantially smaller font than the text on the front label.  Although California law permits Defendants to identify the ingredients which are organically produced with an asterisk (*), Defendants do not designate any of the ingredients as organic.  Thus, there is no way for even the most discerning consumer who pores over every detail on the ingredient list to determine whether all or none of the ingredients are organic.

24.     Defendants' ongoing practice of advertising, marketing, labeling, selling and/or representing the Products as organic – when in fact, the Products contain minimal organic ingredients – is likely to deceive ordinary consumers of the Products and has in fact deceived Plaintiffs.  Plaintiffs reasonably understood the labeling of the Products to mean what it says – that the Products are organic.  Based on the label claims that the Products are organic, Plaintiffs believed that the Products are entirely or predominantly made with organic ingredients.  In reliance on Defendants' claims that the Products are organic, Plaintiffs were willing to pay more for the Products than similar products that do not claim to be organic, and in fact did pay a

1  premium for the Products.

2       25.    COPA includes strict, objective standards regarding what constitutes an organic

3  cosmetic product.  Under COPA, "cosmetic products sold, labeled, or represented as organic or

4  made with organic ingredients shall contain, at least 70 percent organically produced ingredients."

5  Health & Safety Code § 110838(a).  Calculating the percentage of organically produced

6  ingredients under COPA is straightforward.  For products that are sold in solid form, the

7  percentage of organic ingredients is calculated by dividing the weight of the organic ingredients by

8  the total weight of the product, excluding the weight of water and salt.  *Id.* at § 110838(b).  For

9  products that are sold in liquid form, the percentage of organic ingredients is calculated by

10  dividing the fluid volume of the organic ingredients by the fluid volume of the product as a whole,

11  excluding water and salt.  *Ibid.*

12       26.    Under COPA, "sold as organic" means "any use of the term 'organic,' 'organically

13  grown,' or grammatical variations of those terms, whether orally or in writing, in connection with

14  any product grown, handled, processed, sold, or offered for sale in this state, including, but not

15  limited to, any use of these terms in labeling or advertising of any product and any ingredient in a

16  multi-ingredient product."  Health & Safety Code § 110815(k).

17       27.    Defendants' use of the word "organix" on their advertising, packaging and labeling

18  of the Products – which looks nearly identical to, and sounds identical to, the word "organics" –

19  constitutes selling, labeling and representing the Products as organic under COPA.  The Products

20  are thus "sold as organic" pursuant to COPA, as they are advertised and labeled as "organix" and

21  sold in California.  In addition, Defendants' use of the word "organic" on the Product labels, on

22  their websites for the Products and in their advertising also constitutes selling, labeling and

23  representing the Products as organic under COPA.

24       28.    Similarly, Defendants' use of the words "organix" and "organic" in the advertising,

25  marketing, packaging and labeling of the Products are representations made in connection with the

26  sale of the Products and thus constitute express warranties for the Products.

27       29.    COPA includes a private attorney general provision authorizing "any person" to

28  sue to enjoin any violations of the statute.  Health & Safety Code § 111910(a).  In 2011, pursuant

-8-

COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

1   to this provision, the Center for Environmental Health sued Vogue in California state court for its

2   violations of COPA. *See Center for Environmental Health ("CEH") v. Advantage Research*

3   *Laboratories, Inc., et al.*, Alameda County Case No. RG11-580876. On September 13, 2012, the

4   Court in that action entered a Consent Judgment requiring Vogue to change the name of the

5   Products in California from "Organix" to "OGX" by mid-2013 unless the Products are

6   reformulated to contain at least 70 percent organically produced ingredients. Plaintiffs here are

7   not seeking any relief that is inconsistent with the terms of that Consent Judgment. However,

8   because the *CEH* case was limited to injunctive relief under COPA's private attorney general

9   provision, the Consent Judgment did not provide any monetary relief to Plaintiffs or any other

10   affected consumers, did not include any corrective advertising to ameliorate the deception in the

11   marketplace caused by Vogue's longstanding use of the name Organix on the Products, and did

12   not provide any relief whatsoever outside of California. Thus, while Vogue has committed to

13   reformulating the Products or changing the Products' name to OGX in California, the company

14   apparently intends to continue to market the same Products for sale under the Organix name

15   elsewhere.

## CLASS ACTION ALLEGATIONS

17       30.     Pursuant to California Code of Civil Procedure § 382, the California Plaintiffs

18   bring this action on behalf of themselves and the following class of similarly situated individuals:

19         All persons who purchased the Products that were sold under the Organix

20         brand name in California during the applicable statute of limitations.

21         Specifically excluded from this Class are Defendants; the officers,

22         directors or employees of Defendants; any entity in which any Defendant

23         has a controlling interest; and any affiliate, legal representative, heir or

24         assign of Defendants. Also excluded are any federal, state or local

25         governmental entities, any judicial officer presiding over this action and

26         the members of his/her immediate family and judicial staff, and any juror

27         assigned to this action.

28   (the "California Class").

COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

1       31.     Plaintiff Chase also brings this action on behalf of herself and the following class

2   of similarly situated individuals who purchased the Products in New York:

3               All persons who purchased the Products that were sold under the Organix

4               brand name in New York during the applicable statute of limitations.

5               Specifically excluded from this Class are Defendants; the officers,

6               directors or employees of Defendants; any entity in which any Defendant

7               has a controlling interest; and any affiliate, legal representative, heir or

8               assign of Defendants.  Also excluded are any federal, state or local

9               governmental entities, any judicial officer presiding over this action and

10              the members of his/her immediate family and judicial staff, and any juror

11              assigned to this action.

12  (the "New York Class").

13      32.     Plaintiff Shapiro brings this action on behalf of himself and the following class of

14  similarly situated individuals who purchased the Products in Hawaii:

15              All persons who purchased the Products that were sold under the Organix

16              brand name in Hawaii during the applicable statute of limitations.

17              Specifically excluded from this Class are Defendants; the officers,

18              directors or employees of Defendants; any entity in which any Defendant

19              has a controlling interest; and any affiliate, legal representative, heir or

20              assign of Defendants.  Also excluded are any federal, state or local

21              governmental entities, any judicial officer presiding over this action and

22              the members of his/her immediate family and judicial staff, and any juror

23              assigned to this action.

24  (the "Hawaii Class").

25      33.     Plaintiff Brown brings this action on behalf of herself and the following class of

26  similarly situated individuals who purchased the Products in the state of Washington:

27              All persons who purchased the Products that were sold under the Organix

28              brand name in Washington during the applicable statute of limitations.

-10-

COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

1    Specifically excluded from this Class are Defendants; the officers,

2    directors or employees of Defendants; any entity in which any Defendant

3    has a controlling interest; and any affiliate, legal representative, heir or

4    assign of Defendants.  Also excluded are any federal, state or local

5    governmental entities, any judicial officer presiding over this action and

6    the members of his/her immediate family and judicial staff, and any juror

7    assigned to this action.

8    (the "Washington Class").

9    34.    In addition, all Plaintiffs bring this action on behalf of themselves and the

10    following Warranty Class of similarly situated individuals:

11    All persons who purchased the Products that were sold under the Organix

12    brand name in California, New York, Florida, New Jersey, Ohio,

13    Washington, Texas and Hawaii during the applicable statute of limitations.

14    Specifically excluded from this Warranty Class are Defendants; the officers,

15    directors or employees of Defendants; any entity in which any Defendant has

16    a controlling interest; and any affiliate, legal representative, heir or assign of

17    Defendants.  Also excluded are any federal, state or local governmental

18    entities, any judicial officer presiding over this action and the members of

19    his/her immediate family and judicial staff, and any juror assigned to this

20    action.

21    (the "Warranty Class").[1]

22    35.    The Classes are sufficiently numerous, as each includes thousands of persons who

23    have purchased the Products.  Plaintiffs are unable to state the precise number of potential

24    members of the proposed Classes because that information is in the possession of Defendants and

25    their retail customers.  However, the number of members in each of the proposed Classes are so

26    numerous that joinder would be impracticable.  The exact size of each of the proposed Classes and

27

28    [1]  The California Class, the New York Class, the Hawaii Class, the Washington Class and the Warranty Class are together referred to as the "Classes."

-11-

1    the identity of its members will be readily ascertainable from the business records of Defendants

2    and Defendants' retailers, as well as Class members' own records. The disposition of the claims

3    of the members of the Classes in this class action will substantially benefit both the parties and the

4    Court.

5          36.       There is a community of interest among members of the proposed Classes in that

6    there are questions of law and fact common to the proposed Classes that predominate over

7    questions affecting only individual members. Proof of a common set of facts will establish the

8    liability of Defendants and the right of each member of the Classes to relief. These common legal

9    and factual questions, which do not vary among Class members and which may be determined

10   without reference to the individual circumstances of a Class member include, but are not limited to

11   the following:

12          a.       whether Defendants advertise, market, label and sell the Products by

13                   representing that the Products are "organic";

14          b.       whether the Products are predominantly composed of organic ingredients;

15          c.       whether the Products are composed of at least 70% organically produced

16                   ingredients by weight or fluid volume, excluding water and salt;

17          d.       whether Defendants' use of the word "Organix" on the Products'

18                   advertising and labeling constitutes selling, labeling or representing the

19                   Products as organic within the meaning of Health & Safety Code § 110838;

20          e.       whether Defendants' sales of the Products as organic, which contain less

21                   than 70% organic ingredients, violates Health & Safety Code § 110838;

22          f.       whether Defendants' conduct is unethical, oppressive, unscrupulous, and/or

23                   substantially injurious to consumers;

24          g.       whether Defendants' conduct of selling the Products as organic when such

25                   Products are not composed predominantly of organic ingredients is likely to

26                   deceive the members of the Classes;

27          h.       whether Defendants' conduct in advertising and marketing the Products

28                   constitutes a violation of the CLRA;

-12-

COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

i.   whether Defendants' conduct constitutes fraudulent, unfair, or unlawful conduct as defined by the UCL;

j.   whether Plaintiffs and California Class members are entitled to injunctive and other equitable relief based on Defendants' violations of the UCL and CLRA;

k.   whether Defendants' representations concerning the Products constitute express warranties with regard to the Products pursuant to California, New York, Florida, New Jersey, Ohio, Washington, Texas and Hawaii law;

l.   whether Defendants breached the express warranties they have made with regard to the Products;

m.   whether Plaintiffs and the other members of the Warranty Class are entitled to damages resulting from Defendants' breach of the express warranties made regarding the Products;

n.   whether Plaintiffs and the other members of the California Class are entitled to compensatory and punitive damages as a result of Defendants' violations of the CLRA;

o.   whether Plaintiff Chase and the New York Class are entitled to injunctive relief and damages as a result of Defendants' violations of N.Y. Gen. Bus. Law § 349; and

p.   whether Plaintiff Shapiro and the Hawaii Class are entitled to injunctive relief, actual and treble damages pursuant to Haw. Rev. Stat. § 480, *et seq.*

Defendants utilize advertisements and packaging that include uniform misrepresentations that misled Plaintiffs and the other members of the Classes. Thus, there is a well-defined community of interest in the questions of law and fact involved in this action and affecting the parties.

37.   Plaintiffs assert claims that are typical of the claims of the Classes. Plaintiffs and all members of the Classes have been subjected to the same wrongful conduct because they have purchased the Products which are labeled and sold as organic, but, in fact, are not. Plaintiffs and the other members of the Classes have thus all overpaid for the Products.

-13-

COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

38.     Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Classes.  Plaintiffs have no interests antagonistic to those of other members of the Classes.  Plaintiffs are committed to the vigorous prosecution of this action and have retained counsel experienced in litigation of this nature to represent them.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

39.     Proceeding as a class action provides substantial benefits to both the parties and the Court because this is the most efficient method for the fair and efficient adjudication of the controversy.  Members of the Classes have suffered and will suffer irreparable harm and damages as a result of Defendants' wrongful conduct.  Because of the nature of the individual Class members' claims, few, if any, could or would otherwise afford to seek legal redress against Defendants for the wrongs complained of herein, and a representative class action is therefore appropriate, the superior method of proceeding, and essential to the interests of justice insofar as the resolution of Class members' claims is concerned.  Absent a representative class action, members of the Classes would continue to suffer losses for which they would have no remedy, and Defendants would unjustly retain the proceeds of their ill-gotten gains.  Even if separate actions could be brought by individual members of the Classes, the resulting multiplicity of lawsuits would cause undue hardship, burden and expense for the Court and the litigants, as well as create a risk of inconsistent rulings which might be dispositive of the interests of the other members of the Classes who are not parties to the adjudications and/or may substantially impede their ability to protect their interests.

### FIRST CAUSE OF ACTION
**(California Plaintiffs, On Behalf of Themselves and the California Class, Allege Violations of California Business & Professions Code § 17200, *et seq.* Based on Commissions of Unlawful Acts)**

40.     California Plaintiffs reallege and incorporate by reference as if specifically set forth herein Paragraphs 1 through 39, inclusive.

41.     The violation of any law constitutes an unlawful business practice under Business & Professions Code § 17200.

42.     As detailed more fully in the preceding paragraphs, Defendants have violated and

-14-

1   continue to violate provisions of COPA, specifically Health & Safety Code § 110838(a). Such

2   violations are unlawful pursuant to Health & Safety Code § 110890(a).

3      43.   As detailed more fully in the succeeding paragraphs, the acts and practices alleged

4   herein were intended to or did result in the sale of the Products in violation of the CLRA, Cal. Civ.

5   Code § 1750, *et seq.*, specifically California Civil Code Section 1770(a)(5), Section 1770(a)(7),

6   and Section 1770(a)(9).

7      44.   Defendants' conduct also violates Health & Safety Code § 111730, which prohibits

8   the sale of any misbranded cosmetic product. The Products, which contain labeling that falsely

9   state that the Products are organic, are "false or misleading in any particular" in violation of

10   Health & Safety Code § 111730.

11      45.   Defendants' conduct also violates California Business & Professions Code §

12   17580.5, which makes it unlawful for any person to make any untruthful, deceptive, or misleading

13   environmental marketing claim. By misrepresenting that the Products are organic, Defendants are

14   violating Business & Professions Code § 17580.5.

15      46.   Defendants' conduct also breaches their express warranties regarding the Products

16   and California Commercial Code § 2313.

17      47.   By violating COPA, the CLRA, Health & Safety Code § 111730, Business &

18   Professions Code § 17580.5, their express warranties regarding the Products and California

19   Commercial Code § 2313, Defendants have engaged in unlawful business acts and practices which

20   constitute unfair competition within the meaning of Business & Professions Code § 17200.

21      48.   An action for injunctive relief and restitution is specifically authorized under

22   Business & Professions Code § 17203.

23      49.   Plaintiffs purchased the Products, which cost more due to Defendants' unlawful use

24   of the terms "organix" and/or "organic" on the Products' labels. Plaintiffs would not have

25   purchased the Products at all, or would not have paid such a high price for the Products, but for

26   Defendants' false use of the terms "organix" and/or "organic" on the Products' labels. Plaintiffs

27   have thus suffered injury in fact and lost money or property as a direct result of Defendants'

28   violations of law.

-15-

COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

Wherefore, California Plaintiffs pray for judgment against Defendants, as set forth hereafter.

### SECOND CAUSE OF ACTION
**(California Plaintiffs, On Behalf of Themselves and the California Class, Allege Violations of California Business & Professions Code § 17200, *et seq.* Based on Fraudulent Acts and Practices)**

50.     California Plaintiffs reallege and incorporate by reference as if specifically set forth herein Paragraphs 1 through 49, inclusive.

51.     Under Business & Professions Code § 17200, any business act or practice that is likely to deceive members of the public constitutes a fraudulent business act or practice.

52.     Defendants have engaged and continue to engage in conduct that is likely to deceive members of the public.  This conduct includes, but is not limited to, misrepresenting that the Products are organic when, in fact, the Products are not composed predominantly of organic ingredients.  COPA provides a legislative determination that any cosmetic product that does not contain at least 70% organic ingredients, but is represented as organic, is deceptive.  Accordingly, Defendants' violations of COPA are *per se* deceptive under California law.

53.     After reviewing the packaging for the Products, California Plaintiffs purchased the Products in reliance on Defendants' representation that the Products were organic.  California Plaintiffs would not have purchased the Products at all, or would not have paid such a high price for the Products, but for Defendants' false promotion of the Products as organic.  California Plaintiffs have thus suffered injury in fact and lost money or property as a direct result of Defendants' misrepresentations and material omissions.

54.     By committing the acts alleged above, Defendants have engaged in fraudulent business acts and practices, which constitute unfair competition within the meaning of Business & Professions Code § 17200.

55.     An action for injunctive relief and restitution is specifically authorized under Business & Professions Code § 17203.

Wherefore, California Plaintiffs pray for judgment against Defendants, as set forth hereafter.

-16-
COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

EXH 2 – 17

**THIRD CAUSE OF ACTION**
(California Plaintiffs, On Behalf of Themselves and the California Class, Allege
Violations of California Business & Professions Code § 17200, *et seq.*
Based on Unfair Acts and Practices)

56.     California Plaintiffs reallege and incorporate by reference as if specifically set forth herein Paragraphs 1 through 55, inclusive.

57.     Under Business & Professions Code § 17200, any business act or practice that is unethical, oppressive, unscrupulous and/or substantially injurious to consumers, or that violates a legislatively declared policy, constitutes an unfair business act or practice.

58.     Defendants have engaged, and continue to engage, in conduct which is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers.  This conduct includes, but is not limited to, misrepresenting that the Products are organic, even though such Products are not organic under California law.  The gravity of harm caused by Defendants' conduct as described herein far outweighs the utility, if any, of such conduct.

59.     Defendants have engaged, and continue to engage, in conduct that violates the legislatively declared policy of COPA against labeling and representing cosmetic products as organic unless such products are composed of at least 70% organic ingredients by weight or fluid volume, excluding water and salt.  Defendants have further engaged, and continue to engage, in conduct that violates the legislatively declared policy of the CLRA against misrepresenting the characteristics, uses, benefits and quality of goods for sale; the legislatively declared policy of California's Sherman Food, Drug and Cosmetic Act, Health & Safety Code § 109875, *et seq.*, by selling misbranded cosmetic products; the legislatively declared policy of Business & Professions Code § 17580.5 against making false or misleading environmental advertising claims; and the legislatively declared policy of California Commercial Code § 2313 against breaching express warranties made with regard to consumer products.  Defendants gain an unfair advantage over their competitors, whose advertising for cosmetics must comply with the CLRA and California Business & Professions Code § 17508.

60.     Defendants' conduct, including misrepresenting the benefits of the Products, is substantially injurious to consumers.  Such conduct has caused and continues to cause substantial injury to consumers because consumers would not have purchased the Products at all, or would

-17-
COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

EXH 2 – 18

1   not have paid such a high price for the Products, but for Defendants' false promotion of the

2   Products as being organic. Consumers have thus overpaid for the Products. Such injury is not

3   outweighed by any countervailing benefits to consumers or competition. Indeed, no benefit to

4   consumers or competition results from Defendants' conduct. Since consumers reasonably rely on

5   Defendants' representations of the Products and injury results from ordinary use of the Products,

6   consumers could not have reasonably avoided such injury. *Davis v. Ford Motor Credit Co.* (2009)

7   179 Cal. App. 4th 581, 597-98; *see also Drum v. San Fernando Valley Bar Ass'n* (2010) 182 Cal.

8   App. 4th 247, 257 (outlining the third test based on the definition of "unfair" in Section 5 of the

9   FTC Act).

10          61.     By committing the acts alleged above, Defendants have engaged in unfair business

11  acts and practices which constitute unfair competition within the meaning of Business &

12  Professions Code § 17200.

13          62.     An action for injunctive relief and restitution is specifically authorized under

14  Business & Professions Code § 17203.

15          63.     California Plaintiffs purchased the Products in reliance on Defendants'

16  representations that the Products were organic. California Plaintiffs would not have purchased the

17  Products at all, or would not have paid such a high price for the Products, but for Defendants'

18  false promotion that the Products are organic. California Plaintiffs have thus suffered injury in

19  fact and lost money or property as a direct result of Defendants' misrepresentations and material

20  omissions.

21          Wherefore, California Plaintiffs pray for judgment against Defendants, as set forth

22  hereafter.

23                          **FOURTH CAUSE OF ACTION**

24  **(California Plaintiffs, On Behalf of Themselves and the California Class,**
    **Allege Violations of the CLRA)**

25          64.     Plaintiffs reallege and incorporate by reference as if specifically set forth herein

26  Paragraphs 1 through 63, inclusive.

27          65.     Plaintiffs purchased the Products for personal, family or household purposes.

28          66.     The acts and practices of Defendants as described above were intended to deceive

-18-

COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

1  Plaintiffs and the members of the Class as described herein, and have resulted and will result in

2  damages to Plaintiffs and members of the Class.  These actions violated and continue to violate the

3  CLRA in at least the following respects:

4      a.      In violation of Civil Code Section 1770(a)(5), Defendants' acts and

5  practices constitute representations that the Products have characteristics, uses and/or benefits

6  which they do not;

7      b.      In violation of Civil Code Section 1770(a)(7), Defendants' acts and

8  practices constitute representations that the Products are of a particular quality which they are not;

9  and

10     c.      In violation of Civil Code Section 1770(a)(9), Defendants' acts and

11  practices constitute the advertisement of the goods in question without the intent to sell them as

12  advertised.

13     67.     By reason of the foregoing, California Plaintiffs and the California Class members

14  have suffered damages.

15     68.     By committing the acts alleged above, Defendants have violated the CLRA.

16     69.     In compliance with the provisions of California Civil Code § 1782, California

17  Plaintiffs provided written notice to Defendants on July 5, 2012, regarding their intention to seek

18  damages under California Civil Code § 1750, *et seq.*, unless Defendants offer appropriate

19  consideration or other remedy to all affected consumers.  As of the date of the filing of this

20  Complaint, Defendants have not done so.  Accordingly, California Plaintiffs seek damages

21  pursuant to California Civil Code § 1781(a) on behalf of themselves and the California Class.

22     70.     Plaintiffs and the other California Class members are entitled, pursuant to

23  California Civil Code § 1780(a), to an order enjoining the above-described wrongful acts and

24  practices of Defendants, providing actual and punitive damages and restitution to Plaintiff and the

25  California Class members, and ordering the payment of costs and attorneys' fees and any other

26  relief deemed appropriate and proper by the Court under California Civil Code § 1780.

27     Wherefore, California Plaintiffs pray for judgment against Defendants, as set forth

28  hereafter.

-19-

**FIFTH CAUSE OF ACTION**
(Plaintiff Chase, On Behalf of Herself and the New York Class,
Alleges Violations of N.Y. Gen. Bus. Law § 349)

71.     Plaintiff Chase realleges and incorporates by reference as if specifically set forth herein Paragraphs 1 through 70, inclusive.

72.     Plaintiff Chase seeks relief on behalf of herself and the members of the New York Class under New York's General Business Law ("GBL") § 349.  GBL § 349 prohibits deceptive acts or practices in the conduct of any business or in the furnishing of any service in the state of New York.

73.     Defendants have engaged and continue to engage in conduct that is likely to deceive members of the public.  This conduct includes, but is not limited to, misrepresenting that the Products are organic when, in fact, the Products are not composed predominantly of organic ingredients.

74.     Plaintiff Chase purchased the Products after reviewing the front label of such Products based on Defendants' representations that the Products were organic. Plaintiff Chase would not have purchased the Products at all, or would not have paid such a high price for the Products, but for Defendants' false promotion of the Products as organic.  Plaintiff Chase has thus suffered damages.

75.     Accordingly, Plaintiff Chase and members of the New York Class are entitled to actual damages, punitive damages and equitable relief pursuant to GBL § 349.

Wherefore, Plaintiff Chase prays for judgment against Defendants, as set forth hereafter.

**SIXTH CAUSE OF ACTION**
(Plaintiff Shapiro, On Behalf of Himself and the Hawaii Class,
Alleges Violations of Haw. Rev. Stat. § 480-2)

76.     Plaintiffs reallege and incorporate by reference as if specifically set forth herein Paragraphs 1 through 75, inclusive.

77.     Plaintiff Shapiro seeks relief on behalf of himself and the members of the Hawaii Class under Hawaii's Revised Statutes ("HRS") § 480-2.  HRS § 480-2 prohibits unfair and deceptive acts or practices in the conduct of any trade or commerce in Hawaii.

-20-

78.     Defendants have engaged and continue to engage in conduct that is likely to deceive members of the public and that did, in fact, deceive Plaintiff Shapiro. This conduct includes, but is not limited to, misrepresenting that the Products are organic when, in fact, the Products are not composed predominantly of organic ingredients.

79.     Plaintiff Shapiro purchased the Products after reviewing the front of the label of such Product based on Defendants' representations that the Products are organic. Plaintiff Shapiro would not have purchased the Products at all, or would not have paid such a high price for the Products, but for Defendants' false promotion of the Products as organic. Plaintiff Shapiro has thus suffered damages.

80.     In accordance with HRS §§ 480-13(b) and (c), Plaintiff Shapiro and members of the Hawaii Class are entitled to actual and treble damages as well as injunctive relief to prohibit Defendants' unfair and deceptive practices described herein.

Wherefore, Plaintiff Shapiro prays for judgment against Defendants, as set forth hereafter.

**SEVENTH CAUSE OF ACTION**
**(Plaintiff Brown, On Behalf of Herself and the Washington Class,**
**Alleges Violations of Revised Code Washington § 19.86.020)**

81.     Plaintiffs reallege and incorporate by reference as if specifically set forth herein Paragraphs 1 through 80, inclusive.

82.     Plaintiff Brown seeks relief on behalf of herself and the members of the Washington Class under Revised Code Washington ("RCW") § 19.86.020. RCW § 19.86.020 prohibits unfair and deceptive acts or practices in the conduct of any trade or commerce in Washington. The WCPA expressly prohibits misrepresentations of products as organic. RCW § 19.86.023 (cross-referencing RCW § 15.86.030).

83.     Defendants have engaged and continue to engage in conduct that is likely to deceive members of the public and that did, in fact, deceive Plaintiff Brown. This conduct includes, but is not limited to, misrepresenting that the Products are organic when, in fact, the Products are not composed predominantly of organic ingredients.

-21-
COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

84.   Plaintiff Brown purchased the Products after reviewing the front of the label of such Product based on Defendants' representations that the Products are organic.  Plaintiff Brown would not have purchased the Products at all, or would not have paid such a high price for the Products, but for Defendants' false promotion of the Products as organic.  Plaintiff Brown has thus suffered damages.

85.   In accordance with RCW § 19.86.090, Plaintiff Brown and members of the Washington Class are entitled to actual damages as well as injunctive relief to prohibit Defendants' unfair and deceptive practices described herein.

Wherefore, Plaintiff Brown prays for judgment against Defendants, as set forth hereafter.

### EIGHTH CAUSE OF ACTION
**(Plaintiffs, On Behalf of Themselves and the Warranty Class, Allege Breach of Express Warranty)**

86.   Plaintiffs reallege and incorporate by reference as if specifically set forth herein Paragraphs 1 through 85, inclusive.

87.   Defendants' representations that the Products are organic constitute affirmations of fact made with regard to the Products as well as descriptions of the Products.

88.   Defendants' representations that the Products are organic are made on the Products' labels, Defendants' websites promoting the Products, advertising for the Products and Product promotions, and are thus part of the basis of the bargain between Defendants and purchasers of the Products.  Accordingly, such representations constitute express warranties.

89.   As set forth in the paragraphs above, Defendants' statements concerning the Products are false.

90.   Defendants have thus breached their express warranties concerning the Products in violation of the express warranty laws of California, New York, Florida, New Jersey, Ohio, Washington, Texas and Hawaii.  The express warranty laws of these states are fundamentally the same as one another.

91.   By letter dated July 5, 2012, Plaintiffs provided notice to Defendants in advance of

-22-
COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

EXH 2 – 23

1  filing this complaint to apprise them of the claims set forth herein.

2       92.      Plaintiffs and members of the Warranty Class have suffered damages as a result of

3  Defendants' breach in that they paid for Products with qualities and benefits which they failed to

4  receive.

5            Wherefore, Plaintiffs pray for judgment against Defendants, as set forth hereafter.

6                              **PRAYER FOR RELIEF**

7            WHEREFORE, Plaintiffs pray for judgment and relief against Defendants as

8  follows:

9       A.      That the Court declare this a class action;

10      B.      That the Court preliminarily and permanently enjoin Defendants from conducting

11  their business through the unlawful, unfair or fraudulent business acts or practices, untrue and

12  misleading advertising and other violations of law described in this Complaint;

13      C.      That the Court order Defendants to conduct a corrective advertising and

14  information campaign advising consumers that the Products do not have the characteristics, uses,

15  benefits and qualities Defendants have claimed;

16      D.      That the Court order Defendants to implement whatever measures are necessary to

17  remedy the unlawful, unfair or fraudulent business acts or practices, untrue and misleading

18  advertising, and other violations of law described in this Complaint;

19      E.      That the Court order Defendants to notify each and every member of each of the

20  Classes of the pendency of the claims in this action in order to give such individuals and

21  businesses an opportunity to obtain relief from Defendants;

22      F.      That the Court order Defendants to pay restitution to restore to all members of the

23  California Class with all funds acquired by means of any act or practice declared by this Court to

24  be an unlawful, unfair, or a fraudulent business act or practice, untrue or misleading advertising,

25  plus pre- and post-judgment interest thereon;

26      G.      That the Court order Defendants to disgorge all monies wrongfully obtained and all

27  revenues and profits derived by Defendants as a result of their acts or practices in California as

28  alleged in this Complaint;

-23-
COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

EXH 2 - 24

1      H.     That the Court award actual and punitive damages to Plaintiff and the California

2  Class pursuant to the CLRA;

3      I.     That the Court award the greater of actual damages or $50 to Plaintiff Chase and

4  each of the New York Class members pursuant to GBL § 349(h);

5      J.     That the Court award actual and treble damages to Plaintiff Shapiro and each

6  member of the Hawaii Class pursuant to HRS § 480-13.

7      K.     That the Court award actual damages to Plaintiff Brown and each member of the

8  Washington Class pursuant to RCW § 19.86.090.

9      L.     That the Court award damages to Plaintiffs and the Warranty Class to compensate

10  them for Defendants' breach of the express warranties created with regard to the Products;

11      M.    That the Court grant Plaintiffs their reasonable attorneys' fees and costs of suit

12  pursuant to Cal. Code of Civil Procedure § 1021.5, Cal. Civil Code § 1780(e), GBL § 349(h), HRS

13  § 480-13(b), RCW § 19.86.090, the common fund doctrine and/or any other appropriate legal

14  theory; and

15      N.     That the Court grant such other and further relief as may be just and proper

16

17

18

19

20

21

22

23

24

25

26

27

28

-24-
COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

EXH 2 – 25

1

**JURY DEMAND**

2

Plaintiffs demand a trial by jury on all causes of action so triable.

3

4

DATED: October 25, 2012

LEXINGTON LAW GROUP

5

6

7

Mark N. Todzo (State Bar No. 168389)

8

Howard Hirsch (State Bar No. 213209)
Lisa Burger (State Bar No. 239676)

9

LEXINGTON LAW GROUP
503 Divisadero Street

10

San Francisco, CA 94117
Telephone: (415) 913-7800

11

Facsimile: (415) 759-4112
mtodzo@lexlawgroup.com

12

13

Attorneys for Plaintiffs ANDREA GOLLOHER,
MARISA FREEMAN, ROBERTA CHASE,

14

MICHAEL SHAPIRO and BRENDA BROWN

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-25-

COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INTERNATIONAL, INC.

# EXHIBIT 3

LEXINGTON LAW GROUP
Mark N. Todzo (California State Bar No. 168389)
Howard Hirsch (California State Bar No. 213209)
Joseph Mann (California State Bar No. 207968)
Lucas Williams (California State Bar No. 264518
503 Divisadero Street
San Francisco, CA  94117
Telephone:  (415) 913-7800
Facsimile:  (415) 759-4112
mtodzo@lexlawgroup.com

Attorneys for Plaintiffs
ANDREA GOLLOHER, MARISA FREEMAN,
ROBERTA CHASE, JAMES HANKS, MICHAEL
SHAPIRO, BRENDA BROWN, GRETCHEN
SWENSON, CRYSTAL KENNY, KELLY BOTTARI,
RENEE CONOVER, and SHANISHA SANDERS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANDREA GOLLOHER, MARISA FREEMAN, ROBERTA CHASE, JAMES HANKS, MICHAEL SHAPIRO, BRENDA BROWN, GRETCHEN SWENSON, CRYSTAL KENNY, KELLY BOTTARI, RENEE CONOVER, and SHANISHA SANDERS, on behalf of themselves and all others similarly situated, | Case No. C 12-06002 RS |
| | CLASS ACTION |
| Plaintiffs, | FIRST AMENDED COMPLAINT |
| vs. | |
| TODD CHRISTOPHER INTERNATIONAL, INC. DBA VOGUE INTERNATIONAL, a Florida Corporation, and DOES 1-100, | |
| Defendants. | |

PLAINTIFF'S EXHIBIT

3

FIRST AMENDED COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INT'L - Case No. C 12-06002 R      EXH 3 – 1

Plaintiffs Andrea Golloher, Marisa Freeman, Roberta Chase, James Hanks, Michael Shapiro, Brenda Brown, Gretchen Swenson, Crystal Kenny, Kelly Bottari, Renee Conover, and Shanisha Sanders ("Plaintiffs"), on behalf of themselves and those similarly situated based on information and belief and investigation of counsel, except for information based on personal knowledge, hereby allege:

## INTRODUCTION

1.     This First Amended Complaint seeks to remedy the unlawful, unfair, and deceptive business practices of defendant Todd Christopher International, Inc. dba Vogue International ("Defendant" or "Vogue") with respect to its cosmetic products (also referred to as personal care products) sold under the Organix brand name (the "Products"). The Products are advertised, marketed, labeled, sold, and represented as organic, but are composed almost entirely from ingredients that are not organic. All of the Organix Products are prominently marketed and labeled as "Organix," a name which was chosen to look and sound like the word "organics" in order to represent that the Products are organic. In addition, Defendant's marketing materials for the Organix Products are littered with statements that represent the Products as organic, and the front and back labels of some of the Products state that the Products contain organic ingredients. Plaintiffs and the Class reasonably believed Defendant's representations that the Products are organic. But-for Defendant's false and misleading identification of the Products as organic the Plaintiffs and the Class would not have purchased the Products or paid such a high price for the Products instead of purchasing truly organic products available from Defendant's competitors.

2.     Plaintiffs have, all along, perceived a need for resolution of the claims set forth in the original Complaint on a nationwide basis. Since the filing of the original Complaint, facts evidencing liability have come to light that warrant this amendment. Joinder of additional states in this amendment is based on the same core counts and legal theories as were set forth in the original Complaint.

3.     Organic products are made with organically grown plants. As such, organic ingredients are produced without the use of pesticides and other harmful or potentially harmful chemicals. Organic products have gained popularity such that over 70% of households in the

-1-

1   United States now use some organic products each year, even though such products typically cost

2   more than their non-organic counterparts.  Growing concerns over the use of harmful chemicals in

3   the production of non-organic products, together with a desire for more healthy lifestyles, have

4   spurred the popularity of organic products.  One of the fastest growing markets for organic

5   products is that of organic personal care products.  Consumers such as Plaintiffs and the other

6   members of the Class are willing to pay more for organic personal care products such as skin care,

7   hair care, and body care in order to avoid harmful chemicals in favor of more natural ingredients.

8   Defendant takes advantage of this segment of consumers by marketing, advertising, selling,

9   labeling, and representing the Products as organic, and impliedly not containing harmful

10   chemicals, when in fact such Products contain significant amounts of non-organic ingredients.  In

11   fact, the vast majority of the ingredients in the Products are not organic.

12          4.      Defendant's conduct of advertising, marketing, selling, labeling, and representing

13   the Products as organic, when in fact such Products are composed mainly of non-organic

14   ingredients, constitutes unlawful, unfair, and deceptive conduct, is likely to deceive members of

15   the public, is unethical, oppressive, unscrupulous, and/or substantially injurious to consumers,

16   violates legislatively declared policies against misrepresenting the characteristics of goods and

17   services, and harms the organic industry.  As such, Defendant's marketing, labeling and

18   advertising practices violate the consumer protection, unfair trade practices, and/or deceptive acts

19   laws of all 50 states and the District of Columbia.  Defendant's marketing, labeling, and

20   advertising practices also breach the express warranties regarding the Products, and confer an

21   unjust enrichment onto Defendant.  Accordingly, pursuant to the consumer protection, express

22   warranty, and unjust enrichment laws of each of these U.S. jurisdictions, and to remedy

23   Defendant's illegal acts nationwide, Plaintiffs seek an order enjoining Defendant's unfair and

24   deceptive acts or practices, awarding restitution to the individual victims of Defendant's unfair and

25   deceptive practices, and damages.

26          5.      California law expressly prohibits companies such as Defendant from engaging in

27   this type of misleading labeling.  The California Organic Products Act of 2003, Cal. Health &

28   Safety Code § 110810, *et seq.* (hereinafter "COPA"), requires that any cosmetic product sold,

1  labeled, and/or represented as "organic" must be composed of at least 70% organically produced

2  ingredients by weight or fluid volume, excluding water and salt.  The Products are cosmetics that

3  contain far less than 70% organically produced ingredients, excluding water and salt.

4  Nevertheless, Defendant labels, sells, and represents the Products as organic.

5        6.     Use of the Organix label calls into question other similar representations of

6  products as organic, thereby denigrating the reputation of and eroding confidence in organic

7  personal care products that comply with COPA as well as other regulatory provisions nationally.

8  **PARTIES**

9        7.     Plaintiff Andrea Golloher is a resident of California who purchased one or more of

10  the Products.  On or about April 2011, Plaintiff Golloher purchased one of the Products at a retail

11  store in San Jose, California.  The front label of the Product, which Plaintiff Golloher reviewed

12  prior to purchase, prominently displays the word "Organix."  The front label of the Product also

13  represented that the Product is made with "organic" ingredients.  At the time of purchase, Plaintiff

14  Golloher reasonably believed that the Product was either completely or at least mostly organic.

15  Had Plaintiff Golloher known that the Product was made primarily from non-organic ingredients,

16  Plaintiff would not have bought the Product at all, or would not have paid more for the Product

17  than the cost of other non-organic hair products.

18        8.     Plaintiff Marisa Freeman is a resident of California who purchased one or more of

19  the Products.  On or about November 2010, Plaintiff Freeman purchased two of the Products at a

20  retail store in San Francisco, California.  The front label of both Products, which Plaintiff Freeman

21  reviewed prior to purchase, prominently displays the word "Organix."  In addition, the front label

22  of both Products represented that the Products are made with "organic" ingredients.  At the time of

23  purchase, Plaintiff Freeman reasonably believed that both Products were either completely or at

24  least mostly organic.  Had Plaintiff Freeman known that the Products were made primarily from

25  non-organic ingredients, Plaintiff Freeman would not have bought the Products at all, or would not

26  have paid more for the Products than the cost of other non-organic hair products.

27        9.     Plaintiff Roberta Chase is a resident of New York who purchased one or more of

28  the Products.  On or about July 2010, Plaintiff Chase purchased two of the Products in Cobleskill,

1   New York.  The front label of both products, which Plaintiff Chase reviewed prior to purchase,

2   prominently displays the word "Organix."  The front label of both Products also represented that

3   the Products are made with "organic" ingredients.  At the time of purchase, Plaintiff Chase

4   reasonably believed that both Products were either completely or at least mostly organic.  Had

5   Plaintiff Chase known that the Products were made primarily from non-organic ingredients,

6   Plaintiff Chase would not have bought the Products at all, or would not have paid more for the

7   Products than the cost of other non-organic hair products.

8          10.    Plaintiff James Hanks is a resident of New York who purchased one or more of the

9   Products.  On or about September 2012, Plaintiff Hanks purchased one of the Products in New

10  York, New York.  The front label of the product, which Plaintiff Hanks reviewed prior to

11  purchase, prominently displays the word "Organix."  At the time of purchase, Plaintiff Hanks

12  reasonably believed that the Product was either completely or at least mostly organic.  Had

13  Plaintiff Hanks known that the Product was made primarily from non-organic ingredients, Plaintiff

14  Hanks would not have bought the Product at all, or would not have paid more for the Product than

15  the cost of other non-organic personal care products.

16         11.    Plaintiff Michael Shapiro is a resident of Hawaii who purchased one or more of the

17  Organix Products.  During the period from on or about February 2008 up through February 2009,

18  Plaintiff Shapiro regularly purchased two of the Products at retail stores in Haleiwa, Hawaii.  The

19  front labels of both Products, which Plaintiff Shapiro reviewed prior to purchase, prominently

20  display the word "Organix."  The Products' back labels also stated that the Products contain

21  "organic" ingredients.  At the time of his purchases, Plaintiff Shapiro reasonably believed that

22  both Products were either completely or at least mostly organic.  Had Plaintiff Shapiro known that

23  the Products were made primarily from non-organic ingredients, he would not have bought the

24  Products at all, or would not have paid more for the Products than the cost of other non-organic

25  hair products.

26         12.    Plaintiff Brenda Brown is a resident of the state of Washington who purchased one

27  or more of the Organix Products.  During the period from on or about January 2010 up through

28  June 2012, Plaintiff Brown regularly purchased four of the Products at retail stores in Lacey,

-4-

EXH 3 – 5

1   Washington.  During the period from on or about January 2010 up through June 2012, Plaintiff

2   Brown also regularly purchased one of the Products at a retail store in Beaverton, Oregon.  The

3   front label of the Products, which Plaintiff Brown reviewed prior to purchase, prominently

4   displays the word "Organix."  The front label of the Products purchased also represented that the

5   Products are made with "organic" ingredients.  At the time of purchase, Plaintiff Brown

6   reasonably believed the Products were either completely or at least mostly organic.  Had Plaintiff

7   Brown known that the Products were made primarily from non-organic ingredients, Plaintiff

8   Brown would not have bought the Products at all, or would not have paid more for the Products

9   than the cost of other non-organic hair products.

10          13.     Plaintiff Gretchen Swenson is a resident of the state of Florida who purchased one

11   or more of the Organix Products.  During 2012, Plaintiff Swenson purchased two of the Products

12   at two retail stores in Naples, Florida.  The front label of the Products, which Plaintiff Swenson

13   reviewed prior to purchase, prominently displays the word "Organix."  At the time of purchase,

14   Plaintiff Swenson reasonably believed that the Products were either completely or at least mostly

15   organic.  Had Plaintiff Swenson known that the Products were made primarily from non-organic

16   ingredients, Plaintiff Swenson would not have bought the Products at all, or would not have paid

17   more for the Products than the cost of other non-organic hair products.

18          14.     Plaintiff Crystal Kenny is a resident of the state of Illinois who purchased one or

19   more of the Organix Products.  During the period from on or about March 2013 up through May

20   2013, Plaintiff Kenny purchased three of the Products at a retail store in Bolingbrook, Illinois.

21   The front label of the Products, which Plaintiff Kenny reviewed prior to purchase, prominently

22   displays the word "Organix."  At the time of purchase, Plaintiff Kenny reasonably believed that

23   the Products were either completely or at least mostly organic.  Had Plaintiff Kenny known that

24   the Products were made primarily from non-organic ingredients, Plaintiff Kenny would not have

25   bought the Products at all, or would not have paid more for the Products than the cost of other

26   non-organic hair products.

27          15.     Plaintiff Kelly Bottari is a resident of the state of Massachusetts who purchased one

28   or more of the Organix Products.  On or about February 2013, Plaintiff Bottari purchased two of

FIRST AMENDED COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INT'L – Case No. C 12-06002-R

EXH 3 – 6

1   the Products at a retail store in Hadley, Massachusetts. The front label of the Products, which

2   Plaintiff Bottari reviewed prior to purchase, prominently displays the word "Organix." At the

3   time of purchase, Plaintiff Bottari reasonably believed that the Product was either completely or at

4   least mostly organic. Had Plaintiff Bottari known that the Product was made primarily from non-

5   organic ingredients, Plaintiff Bottari would not have bought the Product at all, or would not have

6   paid more for the Product than the cost of other non-organic personal care products.

7       16.    Plaintiff Renee Conover is a resident of the state of North Carolina who purchased

8   one or more of the Organix Products. On or about November 2012, Plaintiff Conover purchased

9   two of the Products at a retail store in Asheville, North Carolina. The front label of the Products,

10  which Plaintiff Conover reviewed prior to purchase, prominently displays the word "Organix." At

11  the time of purchase, Plaintiff Conover reasonably believed that both Products were either

12  completely or at least mostly organic. Had Plaintiff Conover known that the Products were made

13  primarily from non-organic ingredients, Plaintiff Conover would not have bought the Products at

14  all, or would not have paid more for the Products than the cost of other non-organic hair products.

15      17.    Plaintiff Shanisha Sanders is a resident of the state of Ohio who purchased one or

16  more of the Organix Products. Since at least August 2012, Plaintiff Sanders purchased several of

17  the Products at retail stores in and around Columbus, Ohio. The front label of the Products, which

18  Plaintiff Sanders reviewed prior to purchase, prominently displays the word "Organix." At the

19  time of purchase, Plaintiff Sanders reasonably believed that the Products were either completely or

20  at least mostly organic. Had Plaintiff Sanders known that the Products were made primarily from

21  non-organic ingredients, Plaintiff Sanders would not have bought the Products at all, or would not

22  have paid more for the Products than the cost of other non-organic personal care products.

23      18.    Defendant Todd Christopher International, Inc. dba Vogue International is a

24  Florida corporation with its principal place of business in Oldsmar, Florida. Defendant advertises,

25  markets, distributes, and sells the Products in all 50 states and the District of Columbia.

26      19.    DOES 1 through 100 are persons or entities whose true names and capacities are

27  presently unknown to Plaintiffs, and who therefore are sued by such fictitious names. Plaintiffs

28  are informed and believe, and on that basis allege, that each of the fictitiously named defendants

1   perpetrated some or all of the wrongful acts alleged herein and are responsible in some manner for

2   the matters alleged herein.  Plaintiffs will amend this Complaint to state the true names and

3   capacities of such fictitiously named defendants when ascertained.

4        20.    Defendant Todd Christopher International, Inc. dba Vogue International and DOES

5   1-100 are collectively referred to herein as "Defendants."

6                          **JURISDICTION AND VENUE**

7        21.    This Court has original jurisdiction over all causes of action asserted herein

8   pursuant to 28 U.S.C. § 1332(d) because this is a class action involving more than 100 class

9   members, a substantial number of the members of the proposed Class are citizens of a state

10  different from that of Defendant, and the amount in controversy, in the aggregate, exceeds the sum

11  of $5,000,000, exclusive of interest and costs.  In its Notice of Removal regarding Plaintiffs'

12  original complaint, Docket No. 1 (filed Nov. 26, 2012), Defendant stated that the case was

13  removable on these same grounds.

14       22.    This Court has jurisdiction over Defendants because each is a corporation or other

15  entity that has sufficient minimum contacts in California, is a citizen of California, or otherwise

16  intentionally avails itself of the California market either through the distribution, sale, and/or

17  marketing of the Products in the State of California or by having a facility located in California so

18  as to render the exercise of jurisdiction over it by a federal Court in California consistent with

19  traditional notions of fair play and substantial justice.

20       23.    Venue is proper pursuant to 28 U.S.C. § 1391(a) because Defendant is a resident of

21  this District pursuant to 28 U.S.C. § 1391(c), and a substantial part of the events or omissions

22  giving rise to the claim occurred in this District.

23       24.    **Intradistrict Assignment (L.R. 3-2(c) and (d) and 3.5(b))**:  This action arises in

24  San Francisco County in that a substantial part of the events which give rise to the claims asserted

25  herein occurred in San Francisco County.

26                          **BACKGROUND FACTS**

27       25.    In 2006, Defendants introduced their "Organix" line of Products.  Although the

28  Products contain very small quantities of organic ingredients, Defendants selected a brand name

-7-

1  that looks nearly identical to, and sounds identical to, the word "organics," in order to exploit the

2  growing consumer demand for organic products.  To ensure that consumers made the association

3  between "Organix" and "organics," Defendants also emblazoned the word "organic" on the front

4  label of the Products in bold type and littered their advertising materials with references to the

5  Products' allegedly organic properties.  Nevertheless, the Products are largely composed of

6  ingredients which Defendants admit are not organic.

7      26.    Defendants' scheme to exploit consumer demand for organic products by falsely

8  advertising the Products as organic has been extraordinarily successful.  Since the brand's

9  inception, annual dollar sales of the Products have increased from almost $9 million in 2007, to

10  over $30 million in 2008, to over $40 million in 2009, to over $50 million in 2010, to over $60

11  million through the first half of 2011 (the last time period for which sales figures are publicly

12  available).

13      27.    In or about May 2007, Vogue submitted its initial application to the United States

14  Patent and Trademark Office ("USPTO") to register the Organix trade name for use on personal

15  care products.  In or about March 2008, the USPTO rejected this application on the grounds that

16  Vogue had *not* limited the description of goods to personal care products "comprised of primarily

17  organic ingredients" (emphasis in original).

18      28.    In or about October 2008, Vogue submitted another application to the USPTO, and

19  yet again failed to limit the description of goods to organic personal care products.  The USPTO's

20  initial response was to reject the application again, finding that, "If applicant uses, or intends to

21  use, the mark on goods other than those that are organic, such use would be deceptive . . . .

22  Therefore, applicant must amend the identification by limiting it to organic goods."  In response,

23  Vogue amended its application to limit use of the trademark Organix on "organic" personal care

24  products, which USPTO ultimately approved.  Although Vogue changed the description of its

25  goods to secure USPTO approval of the trademark, Defendants did not change the formulation of

26  the Products.  In fact, the Products all contain less than 10 percent organic ingredients – in most

27  instances, far less.

28      29.    Defendants advertise, market, label, sell, and represent the Products as organic.  In

1  recognition of the fact that consumers will pay more for organic products, Defendants prominently

2  display the word "Organix" on the front label of every Product.  Defendants advertise the Products

3  within the Organix line as organic by use of the Organix brand name and by inclusion of the word

4  "organic" on the Products' front and/or back labels and in Product advertising.

5          30.      While the Products are marketed in various blends (or "flavors" – *e.g.*, "Coconut

6  Milk"), in any given promotional cycle or year Defendants utilize uniform containers, packaging,

7  marketing, and advertising materials for the Products regardless of blend/flavor.  For instance, the

8  Products from each promotional cycle always contain the word "Organix" emblazoned on the

9  front of the packaging in the same location, coloring, and font.

10          31.      While continuing to use the basic "Organix" theme, Defendants have, at times,

11  updated and changed their containers, packaging, marketing, and advertising to appeal to

12  prevailing market trends and attracting new customers who may not have been drawn to

13  Defendants' products previously, while maintaining the interest of the existing customer base.

14  Accordingly, the Class size has increased over time as have the resulting damages attributable to

15  the sales of "Organix" brand products.

16          32.      Since the brand's inception, Defendant has continued to push and expand its use of

17  the "Organix" concept in various ways to ever increase its market share.  In addition to concerns

18  regarding the effect of non-organic chemicals on their own bodies, many consumers who embrace

19  the "organic lifestyle" pursue such a lifestyle by purchasing organic products.  By misleading

20  consumers about its Products, Defendant undermines those efforts, misleading consumers to buy

21  Defendant's non-organic products in lieu of truly organic ones.

22          33.      Each year, Defendant has issued new and updated "Organix"-themed advertising in

23  print and on its website, blog, Facebook page and Twitter account, as well as in other promotions

24  and promotional tie-ins.  For example, in addition to noting the organic attributes of Defendant's

25  products, such "Organix"-themed advertising has, at different times, focused on Vogue's "green

26  packaging," the environment, nature, natural elements of the products, and the planet, all of which

27  Defendant used to retain consumer interest as well as attract new customers.

28          34.      The Products are all intended to be rubbed, poured, sprinkled, or sprayed on,

-9-

FIRST AMENDED COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INT'L - Case No. C 12-06002      EXH 3 – 10

1  introduced into, or otherwise applied to, the human body, or any part of the human body, for

2  cleansing, beautifying, promoting attractiveness, or altering the appearance, and are thus

3  "cosmetics" under California law.  Cal. Health & Safety Code § 109900.

4      35.    While prominently displaying the word "Organix" on the front label of every

5  Product, Defendants also include an ingredient list in small print on the back label of each

6  Product.  The list of ingredients is in a substantially smaller font than the text on the front label.

7  Although California law permits Defendants to identify the ingredients which are organically

8  produced with an asterisk (*), Defendants do not designate any of the ingredients as organic.

9  Thus, there is no way for even the most discerning consumer who pores over every detail on the

10 ingredient list to determine whether all or none of the ingredients are organic.

11     36.    Defendants' ongoing practice of advertising, marketing, labeling, selling, and/or

12 representing the Products as organic – when in fact, the Products contain minimal organic

13 ingredients – is likely to deceive ordinary consumers of the Products and has in fact deceived

14 Plaintiffs.  Plaintiffs reasonably understood the labeling of the Products to mean what it says – that

15 the Products are organic.  Based on the label claims that the Products are organic, Plaintiffs

16 believed that the Products are entirely or predominantly made with organic ingredients.  In

17 reliance on Defendants' claims that the Products are organic, Plaintiffs were willing to pay more

18 for the Products than similar products that do not claim to be organic, and in fact did pay a

19 premium for the Products.

20     37.    COPA includes strict, objective standards regarding what constitutes an organic

21 cosmetic product.  Under COPA, "cosmetic products sold, labeled, or represented as organic or

22 made with organic ingredients shall contain, at least 70 percent organically produced ingredients."

23 Cal. Health & Safety Code §110838(a).  Calculating the percentage of organically produced

24 ingredients under COPA is straightforward.  For products that are sold in solid form, the

25 percentage of organic ingredients is calculated by dividing the weight of the organic ingredients by

26 the total weight of the product, excluding the weight of water and salt.  Id. at §110838(b).  For

27 products that are sold in liquid form, the percentage of organic ingredients is calculated by

28 dividing the fluid volume of the organic ingredients by the fluid volume of the product as a whole,

-10-

1   excluding water and salt. *Ibid.*

2       38.    Under COPA, "sold as organic" means "any use of the term 'organic,' 'organically

3   grown,' or grammatical variations of those terms, whether orally or in writing, in connection with

4   any product grown, handled, processed, sold, or offered for sale in this state, including, but not

5   limited to, any use of these terms in labeling or advertising of any product and any ingredient in a

6   multi-ingredient product." Cal. Health & Safety Code §110815(k).

7       39.    Defendants' use of the word "organix" on their advertising, packaging, and labeling

8   of the Products – which looks nearly identical to, and sounds identical to, the word "organics" –

9   constitutes selling, labeling, and representing the Products as organic under COPA. The Products

10   are thus "sold as organic" pursuant to COPA, as they are advertised and labeled as "organix" and

11   sold in California. In addition, Defendants' use of the word "organic" on the Product labels, on

12   their websites for the Products and in their advertising also constitutes selling, labeling, and

13   representing the Products as organic under COPA.

14       40.    Similarly, Defendants' use of the words "organix" and "organic" in the advertising,

15   marketing, packaging, and labeling of the Products are representations made in connection with

16   the sale of the Products and thus constitute express warranties for the Products.

17       41.    COPA includes a private attorney general provision authorizing "any person" to

18   sue to enjoin any violations of the statute. Cal. Health & Safety Code § 111910(a). In 2011,

19   pursuant to this provision, the Center for Environmental Health sued Vogue in California state

20   court for its violations of COPA. *See Center for Environmental Health ("CEH") v. Advantage*

21   *Research Laboratories, Inc., et al.*, Alameda County Case No. RG11-580876. On September 13,

22   2012, the Court in that action entered a Consent Judgment requiring Vogue to change the name of

23   the Products in California from "Organix" to "OGX" by mid-2013 unless the Products are

24   reformulated to contain at least 70 percent organically produced ingredients. Plaintiffs here are

25   not seeking any relief that is inconsistent with the terms of that Consent Judgment. However,

26   because the *CEH* case was limited to injunctive relief under COPA's private attorney general

27   provision, the Consent Judgment did not provide any monetary relief to Plaintiffs or any other

28   affected consumers, did not include any corrective advertising to ameliorate the deception in the

1    marketplace caused by Vogue's longstanding use of the name Organix on the Products, and did

2    not provide any relief whatsoever outside of California.  Thus, while Vogue has committed to

3    reformulating the Products or changing the Products' name to OGX in California, the company

4    apparently intends to continue to market the same Products for sale under the Organix name

5    elsewhere.

6                              **CLASS ACTION ALLEGATIONS**

7            42.      Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this action on

8    behalf of themselves and the following class of similarly situated individuals nationwide who

9    purchased the Products in every state and the District of Columbia:

10                   All persons who purchased the Products that were sold under the Organix

11                   brand name in the United States on or after October 25, 2008.  Specifically

12                   excluded from this Class are Defendants; the officers, directors, or

13                   employees of Defendants; any entity in which any Defendant has a

14                   controlling interest; and any affiliate, legal representative, heir, or assign

15                   of Defendants.  Also excluded are any federal, state, or local governmental

16                   entities, any judicial officer presiding over this action and the members of

17                   his/her immediate family and judicial staff, and any juror assigned to this

18                   action.

19   (the "Class").

20           43.      The Class is sufficiently numerous, as it includes thousands of persons who have

21   purchased the Products.  Plaintiffs are unable to state the precise number of potential members of

22   the proposed Class because that information is in the possession of Defendants and their retail

23   customers.  However, the number of members in the proposed Class is so numerous that joinder

24   would be impracticable for purposes of Rule 23(a)(1).  The disposition of the claims of the

25   members of the Class in this class action will substantially benefit both the parties and the Court.

26           44.      There is a community of interest among members of the proposed Class in that

27   there are questions of law and fact common to the proposed Class for purposes of Rule 23(a)(2),

28   including whether Defendants' labels, advertisements, and packaging include uniform

1   misrepresentations that misled Plaintiffs and the other members of the Class to believe that the

2   Products were predominantly made with organic ingredients.  Proof of a common set of facts will

3   establish the liability of Defendants and the right of each member of the Class to relief.

4       45.    Plaintiffs assert claims that are typical of the claims of the Class for purposes of

5   Rule 23(a)(3).  Plaintiffs and all members of the Class have been subjected to the same wrongful

6   conduct because they have purchased the Products which are labeled and sold as organic, but, in

7   fact, are not.  Plaintiffs and the other members of the Class have thus all overpaid for the Products.

8       46.    Plaintiffs will fairly and adequately represent and protect the interests of the other

9   members of the Class for purposes of Rule 23(a)(4).  Plaintiffs have no interests antagonistic to

10  those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this

11  action and have retained counsel experienced in litigation of this nature to represent them.

12  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

13      47.    Class certification is appropriate under Rule 23(b)(3) because common questions of

14  law and fact substantially predominate over any questions that may affect only individual

15  members of the Class.  These common legal and factual questions, which do not vary among Class

16  members and which may be determined without reference to the individual circumstances of any

17  Class member, include but are not limited to the following:

18      a.    whether Defendants advertise, market, label, and sell the Products by

19            representing that the Products are "organic";

20      b.    whether the Products are predominantly composed of organic ingredients;

21      c.    whether Defendants' conduct of selling the Products as organic when such

22            Products are not composed predominantly of organic ingredients is likely to

23            deceive the members of the Class;

24      d.    whether Defendants' conduct in advertising and marketing the Products

25            constitutes an unfair or deceptive act or practice in the conduct of trade or

26            commerce;

27      e.    whether Plaintiffs and the other members of the Class are entitled to

28            injunctive and other equitable relief based on Defendants' violations of state

-13-

1      and District of Columbia consumer protection laws;

2      f.   whether Plaintiffs and the other members of the Class are entitled to an

3           award of damages as a result of Defendants' violations of state and District

4           of Columbia consumer protection laws;

5      g.   whether Defendants' representations concerning the Products constitute

6           express warranties with regard to the Products pursuant to the laws of every

7           state and the District of Columbia;

8      h.   whether Defendants breached the express warranties they have made with

9           regard to the Products;

10     i.   whether Plaintiffs and the other members of the Class are entitled to

11          damages resulting from Defendants' breach of the express warranties made

12          regarding the Products in every state and the District of Columbia;

13     j.   whether Defendants unjustly enriched themselves to the detriment of the

14          Plaintiffs and the members of the Class, thereby entitling Plaintiffs and the

15          members of the Class to restitution or disgorgement of all benefits derived

16          by Defendants.

17   Defendants utilize advertisements and packaging that include uniform misrepresentations that

18   misled Plaintiffs and the other members of the Class.  Thus, there is a well-defined community of

19   interest in the questions of law and fact involved in this action and affecting the parties.

20        48.   Proceeding as a class action provides substantial benefits to both the parties and the

21   Court because this is the most efficient method for the fair and efficient adjudication of the

22   controversy.  Members of the Class have suffered and will suffer irreparable harm and damages as

23   a result of Defendants' wrongful conduct.  Because of the nature of the individual Class members'

24   claims, few, if any, could or would otherwise afford to seek legal redress against Defendants for

25   the wrongs complained of herein, and a representative class action is therefore appropriate, the

26   superior method of proceeding, and essential to the interests of justice insofar as the resolution of

27   Class members' claims is concerned.  Absent a representative class action, members of the Class

28   would continue to suffer losses for which they would have no remedy, and Defendants

FIRST AMENDED COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INT'L - Case No. C 12-06002 1                    EXH 3 – 15

1  unjustly retain the proceeds of their ill-gotten gains.  Even if separate actions could be brought by

2  individual members of the Class, the resulting multiplicity of lawsuits would cause undue

3  hardship, burden, and expense for the Court and the litigants, as well as create a risk of

4  inconsistent rulings which might be dispositive of the interests of the other members of the Class

5  who are not parties to the adjudications and/or may substantially impede their ability to protect

6  their interests.

### FIRST CAUSE OF ACTION
7
**(Plaintiffs, On Behalf of Themselves and the Class,**
8  **Allege Violations of Consumer Protection Laws)**

9       49.     Plaintiffs reallege and incorporate by reference as if specifically set forth herein

10  Paragraphs 1 through 48, inclusive.

11       50.     As a theory of recovery distinct from and independent of the other counts alleged

12  herein, Plaintiffs seek relief on behalf of themselves and the members of the Class under the

13  consumer protection, unfair trade practices, and deceptive acts laws of each of the following

14  jurisdictions:

15            a.     __Alabama:__  Alabama's Deceptive Trade Practices Act, Ala. Code § 8-19-1,

16  *et seq.*, including but not limited to Ala. Code §§ 8-19-5(2), (3), (5), (7), (8), (9), and (27);

17            b.     __Alaska:__  Alaska's Unfair Trade Practices and Consumer Protection Act,

18  Alaska Stat. § 45.50.471, *et seq.*, including but not limited to Alaska Stat. §§ 45.50.471(3), (4),

19  (6), (7), (8), (11), and (12).

20            c.     __Arizona:__  Arizona's Consumer Fraud Act, Ariz. Rev. Stat. Ann. § 44-1521,

21  *et seq.*;

22            d.     __Arkansas:__  Arkansas's Deceptive Trade Practices Act, Ark. Code Ann. § 4-

23  88-101, *et seq.*, including but not limited to Ark. Code Ann. §§ 4-88-107(1), (2) , (3), and (10);

24            e.     __California:__  California's Unfair Competition Law, Cal. Bus. & Prof. Code

25  § 17200, *et seq.*, and Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, 1770, *et seq.*,

26  including but not limited to Cal. Civ. Code §§ 1770(a)(2), (3), (5), (7), (8), and (9);

27            f.     __Colorado:__  Colorado's Consumer Protection Act, Colo. Rev. Stat. § 6-1-

28  101, *et seq.*, including but not limited to Colo. Rev. Stat. §§ 6-1-101(1)(b), (c), (e), (g), (h), (i), and

-15-

1   (u);

2        g.   **Connecticut:**  Connecticut's Unfair Trade Practices Act, Conn. Gen. Stat. §

3   42-110a, *et seq.*;

4        h.   **Delaware:**  Delaware's Consumer Fraud Act, Del. Code Ann. tit. 6, § 2511,

5   *et seq.*, and Deceptive Trade Practices Act, Del. Code Ann. tit. 6, § 2531, *et seq.*, including but not

6   limited to Del. Code Ann. tit. 6, §§ 2532(a)(2), (3), (5), (7), (8), (9), and (12);

7        i.   **District of Columbia:**  the District of Columbia's Consumer Protection

8   Act, D.C. Code § 28-3901, *et seq.*, including but not limited to D.C. Code §§ 28-3904(a), (d), (e),

9   (f), (f-1), (g), and (h);

10       j.   **Florida:**  Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §

11   501.201, *et seq.*;

12       k.   **Georgia:**  Georgia's Fair Business Practices Act, Ga. Code Ann. § 10-1-

13   390, *et seq.*, including but not limited to Ga. Code Ann. §§ 10-1-393(b)(2), (3), (5), (7), (8) and

14   (9);

15       l.   **Hawaii:**  Hawaii's Deceptive Practices Act, Haw. Rev. Stat. § 481A-1, *et*

16   *seq.*, including but not limited to Haw. Rev. Stat. § 481A-3(a)(2), (3), (5), (7), (8), (9), and (12);

17       m.   **Idaho:**  Idaho's Consumer Protection Act, Idaho Code Ann. § 48-601, *et*

18   *seq.*, including but not limited to Idaho Code Ann. § 48-603(2), (3), (5), (7), (8), (9), and (17);

19       n.   **Illinois:**  Illinois's Consumer Fraud and Deceptive Business Practices Act,

20   815 Ill. Comp. Stat. § 505/1, *et seq.*, and Uniform Deceptive Trade Practices Act, 815 Ill. Comp.

21   Stat. § 510/1, *et seq.*, including but not limited to 815 Ill. Comp. Stat. § 510/2(a)(2), (3), (5), (7),

22   (8), (9), and (12);

23       o.   **Indiana:**  Indiana's Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-

24   0.5-1, *et seq.*;

25       p.   **Iowa:**  Iowa's Consumer Fraud Act, Iowa Code § 714.16;

26       q.   **Kansas:**  Kansas's Consumer Protection Act, Kan. Stat. Ann. § 50-623, *et*

27   *seq.*, including but not limited to Kan. Stat. Ann. § 50-626(b)(1)(A), (1)(B), (1)(D), (1)(F), (2), (3),

28   and (4);

1          r.     **Kentucky:** Kentucky's Consumer Protection Act, Ky. Rev. Stat. Ann. §

2 367.110, *et seq.*;

3          s.     **Louisiana:** Louisiana's Unfair Trade Practices and Consumer Protection

4 Law, La. Rev. Stat. Ann.§ 51:1401, *et seq.*;

5          t.     **Maine:** Maine's Unfair Trade Practices Act, Me. Rev. Stat. tit. 5, § 205-A,

6 *et seq.*, and Deceptive Trade Practices Act, Me. Rev. Stat. tit. 10, § 1211, *et seq.*, including but not

7 limited to Me. Rev. Stat. tit. 10, § 1211(1)(B), (C), (E), (G), (H), (I), (L);

8          u.     **Maryland:** Maryland's Consumer Protection Act, Md. Code Ann. Com.

9 Law § 13-101, *et seq.*, including but not limited to Md. Code Ann. Com. Law § 13-301(1), (2)(i),

10 (2)(ii), (2)(iv), (3), (4), and (9)(i);

11          v.     **Massachusetts:** Massachusetts's Consumer Protection Act, Mass. Gen.

12 Laws ch. 93A, § 1, *et seq.*;

13          w.     **Michigan:** Michigan's Consumer Protection Act, Mich. Comp. Laws §

14 445.901, *et seq.*, including but not limited to Mich. Comp. Laws § 445.903(1)(a), (c), (e), (f), (g),

15 (s), (bb), and (cc);

16          x.     **Minnesota:** Minnesota's Prevention of Consumer Fraud Act, Minn. Stat. §

17 325F.68, *et seq.*, and Uniform Deceptive Trade Practices law, Minn. Stat. § 325D.43, *et seq.*,

18 including but not limited to Minn. Stat. § 325D.44(2), (3), (5), (7), (8), (9), and (13);

19          y.     **Mississippi:** Mississippi's Consumer Protection Act, Miss. Code Ann. §

20 75-24-1, *et seq.*, including but not limited to Miss. Code Ann. § 75-24-5(2)(b), (c), (e), (g), (h),

21 and (i);

22          z.     **Missouri:** Missouri's Merchandising Practices Act, Mo. Rev. Stat. §

23 407.010, *et seq.*;

24          aa.     **Montana:** Montana's Unfair Trade Practices and Consumer Protection

25 Act, Mont. Code. Ann. § 30-14-103, *et seq.*, and § 30-14-201, *et seq.*;

26          bb.     **Nebraska:** Nebraska's Consumer Protection Act, Neb. Rev. Stat. § 59-

27 1601, *et seq.*, and Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.*,

28 including but not limited to Neb. Rev. Stat. § 87-302(a)(2), (3), (5), (7), (8), and (9);

FIRST AMENDED COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INT'L - Case No. C 12-06002 1       EXH 3 – 18

1         cc.   **Nevada:**  Nevada's Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. §

2 598.0903, *et seq.*, including but not limited to Nev. Rev. Stat. Ann. § 598.0915(2), (3), (5), (7),

3 (8), (9), (15), and Nev. Rev. Stat. Ann. § 41.600;

4         dd.   **New Hampshire:**  New Hampshire's Regulation of Business Practices for

5 Consumer Protection, N.H. Rev. Stat. Ann. § 358-A:1, *et seq.*, including but not limited to N.H.

6 Rev. Stat. Ann. § 358-A:2(II), (III), (V), (VII), (VIII), and (IX);

7         ee.   **New Jersey:**  New Jersey's Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1,

8 *et seq.*;

9         ff.   **New Mexico:**  New Mexico's Unfair Practices Act, N.M. Stat. Ann. § 57-

10 12-1, *et seq.*, including but not limited to N.M. Stat. Ann. § 57-12-2(D)(2), (3), (5), (7), and (8);

11         gg.   **New York:**  New York's Deceptive Practices Act, N.Y. Gen. Bus. Law §§

12 349 and 350;

13         hh.   **North Carolina:**  North Carolina's Unfair Deceptive Trade Practices Act,

14 N.C. Gen. Stat. § 75-1.1, *et seq.*;

15         ii.   **North Dakota:**  North Dakota's Unlawful Sales or Advertising Practices

16 Law, N.D. Cent. Code § 51-15-01, *et seq.*;

17         jj.   **Oklahoma:**  Oklahoma's Consumer Protection Act , Okla. Stat. tit. 15, §

18 751, *et seq.*, including but not limited to Okla. Stat. tit. 15, § 753(2), (3), (5), (7), (8), and (20), and

19 Deceptive Trade Practices Act, Okla. Stat. tit. 78, § 51, *et seq.*, including but not limited to Okla.

20 Stat. tit. 78, § 53(2), (3), (5), (7), (8), and (9);

21         kk.   **Ohio:**  Ohio's Consumer Sales Practices Act, Ohio Rev. Code Ann. §

22 1345.01, *et seq.* and Ohio Rev. Code Ann. § 4165.01, *et seq.*, including but not limited to Ohio

23 Rev. Code Ann. § 4165.02(A)(2)(3)(7)(9)(10)(11);

24         ll.   **Oregon:**  Oregon's Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605,

25 *et seq.*, including but not limited to Or. Rev. Stat. § 646.608(1)(b), (c), (e), (g), (h), (i) and (u);

26         mm.   **Pennsylvania:**  Pennsylvania's Unfair Trade Practices and Consumer

27 Protection Law, 73 Pa. Stat. Ann. § 201-1, *et seq.*, including but not limited to 73 Pa. Stat. Ann. §

28 201-2(4)(ii), (iii), (v), (vii), (viii), (ix), and (xxi);

1    nn.   **Rhode Island:**  Rhode Island's Deceptive Trade Practices Act, R.I. Gen.

2  Laws § 6-13.1-1, *et seq.*, including but not limited to R.I. Gen. Laws § 6-13.1-1(6)(ii), (iii), (v),

3  (vii), (viii), (ix), (xiii), and (xiv);

4    oo.   **South Carolina:**  South Carolina's Unfair Trade Practices Act, S.C. Code

5  Ann. § 39-5-10, *et seq.*;

6    pp.   **South Dakota:**  South Dakota's Deceptive Trade Practices and Consumer

7  Protection Act, S.D. Codified Laws § 37-24-1, *et seq.*;

8    qq.   **Tennessee:**  Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-

9  18-101, *et seq.*, including but not limited to Tenn. Code Ann. § 47-18-104(b)(2), (3), (5), (7), (8),

10  and (9);

11    rr.   **Texas:**  Texas's Deceptive Trade Practices Consumer Protection Act, Tex.

12  Bus. & Com. Code Ann. § 17.41, *et seq.*, including but not limited to Tex. Bus. & Com. Code

13  Ann. § 17.46(b)(2), (3), (5), (7), (8), and (9);

14    ss.   **Utah:**  Utah's Consumer Sales Practices Act, Utah Code Ann. § 13-11-1, *et*

15  *seq.*, and Truth in Advertising Law, Utah Code Ann. § 13-11a-1, *et seq.*, including but not limited

16  to Utah Code Ann. § 13-11a-3(1)(b), (c), (e), (g), (h), (i), and (t);

17    tt.   **Vermont:**  Vermont's Consumer Fraud Act, Vt. Stat. Ann. tit. 9 § 2451, *et*

18  *seq.*;

19    uu.   **Virginia:**  Virginia's Consumer Protection Act, Va. Code Ann. § 59.1-198,

20  *et seq.*;

21    vv.   **Washington:**  Washington's Consumer Protection Act, Rev. Code Wash. §

22  19.86.010, *et seq.*;

23    ww.   **West Virginia:**  West Virginia's Consumer Credit and Protection Act, W.

24  Va. Code § 46A-1-101, *et seq.*, and W. Va. Code § 46A-6-101, *et seq.*, including but not limited to

25  W. Va. Code § 46A-1-102(7)(B), (C), (E), (G), (H), (I), (L), and (M);

26    xx.   **Wisconsin:**  Wisconsin's Consumer Act, Wis. Stat. §421.101, *et seq.*;

27    yy.   **Wyoming:**  Wyoming's Consumer Protection Act, Wyo. Stat. Ann. §40-12-

28  101, *et seq.*

1  Each of the aforementioned laws prohibits unfair and deceptive acts or practices in the conduct of

2  trade or commerce within that jurisdiction.  The referenced conduct includes that which directly

3  and indirectly injures the Plaintiffs and Class members, by:

4       a.    Causing confusion or misunderstanding as to the source, sponsorship,

5           approval, or certification of Defendant or Defendant's Products;

6       b.    Causing confusion or misunderstanding as to Defendant's or Defendant's

7           Products' affiliation, connection, or association with, or certification by

8           another;

9       c.    Representing that the Products have sponsorship, approval, characteristics,

10          ingredients, uses, benefits, or qualities that they do not have;

11      d.    Representing that Defendant has sponsorship, approval, status, affiliation,

12          or connection that it does not have;

13      e.    Representing that the Products are of a particular standard, quality, or grade,

14          when they are of another;

15      f.    Disparaging the goods, products, or business of another by false or

16          misleading representation of fact; and

17      g.    Advertising the Products with intent not to sell them as advertised.

18    51.    Defendants have engaged and continue to engage in conduct that is likely to

19  deceive members of the public in each of these jurisdictions, including members of the Class, and

20  that did, in fact, deceive Plaintiffs.  This conduct includes, but is not limited to, misrepresenting

21  that the Products are organic when, in fact, the Products are not composed predominantly of

22  organic ingredients.

23    52.    Plaintiffs purchased the Products after reviewing the front of the label of such

24  Product based on Defendants' representations that the Products are organic.  Plaintiffs would not

25  have purchased the Products at all, or would not have paid such a high price for the Products, but

26  for Defendants' false promotion of the Products as organic.  Plaintiffs have thus suffered damages.

27    53.    Pursuant to consumer protection, unfair trade practices, and deceptive acts laws of

28  the aforementioned jurisdictions, Plaintiffs and the other members of the Class are entitled to an

FIRST AMENDED COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INT'L - Case No. C 12-06002    EXH 3 – 21

1 order enjoining the above-described unfair and deceptive acts and practices of Defendants, an

2 award of actual, punitive, treble, and/or statutory damages, an award of costs and attorneys' fees,

3 and any other relief deemed appropriate and proper by the Court or permitted pursuant to the

4 relevant law.

5         Wherefore, Plaintiffs pray for judgment against Defendants, as set forth hereafter.

6 ### SECOND CAUSE OF ACTION
**(Plaintiffs, On Behalf of Themselves and the Class,
Allege Breach of Express Warranty)**

7

8     54.    Plaintiffs reallege and incorporate by reference as if specifically set forth herein

9 Paragraphs 1 through 53, inclusive.

10     55.    Defendants' representations that the Products are organic constitute affirmations of

11 fact made with regard to the Products as well as descriptions of the Products. Defendants make

12 these representations regarding the Products in all 50 states and the District of Columbia.

13     56.    Defendants' representations that the Products are organic are made on the Products'

14 labels, Defendants' websites promoting the Products, advertising for the Products, and Product

15 promotions, and are thus part of the basis of the bargain between Defendants and purchasers of the

16 Products. Accordingly, such representations constitute express warranties.

17     57.    As set forth in the paragraphs above, Defendants' statements concerning the

18 Products are false.

19     58.    Defendants have thus breached their express warranties concerning the Products in

20 violation of the express warranty laws of every state and the District of Columbia.

21     59.    By letters dated July 5, 2012 and July 22, 2013, Plaintiffs provided notice to

22 Defendants in advance of filing this complaint to apprise them of the claims set forth herein and

23 demanding relief on behalf of themselves and the other members of the Class, including monetary

24 damages. As of the date of the filing of this Complaint, Defendants have not provided the relief

25 requested.

26     60.    Plaintiffs and members of the Class have suffered damages as a result of

27 Defendants' breach in that they paid for Products with qualities and benefits which they failed to

28 receive.

-21-

1     61.    As a theory of recovery distinct from and independent of the other counts alleged

2 herein, pursuant to the express warranty laws of the aforementioned jurisdictions, Plaintiffs and

3 the other members of the Class are entitled to an award of compensatory damages.

4           Wherefore, Plaintiffs pray for judgment against Defendants, as set forth hereafter.

### THIRD CAUSE OF ACTION
**(Plaintiffs, On Behalf of Themselves and the Class,**
**Allege Restitution/Unjust Enrichment)**

7     62.    Plaintiffs reallege and incorporate by reference as if specifically set forth herein

8 Paragraphs 1 through 61, inclusive.

9     63.    Consumers, such as Plaintiffs and the other members of the Classes, are willing to

10 pay more for organic personal care products. Defendants advertise, market, label, sell, and

11 represent the Products as organic, when in fact such Products contain significant amounts of non-

12 organic ingredients.

13     64.    Had Plaintiffs known that the Products were made primarily from non-organic

14 ingredients, Plaintiffs would not have bought the Products at all, or would not have paid more for

15 the Products than the cost of other non-organic personal care products.

16     65.    Defendants have benefitted from their advertising, marketing, and labeling

17 practices concerning the Products, and it would be inequitable under the circumstances for

18 Defendants to be permitted to retain these benefits.

19     66.    To the extent that full relief is unavailable under any of the other causes of action

20 pleaded in this Complaint, Plaintiffs and members of the Class have no adequate remedy at law.

21     67.    As a theory of recovery distinct from and independent of the other counts alleged

22 herein, Plaintiffs and members of the Class are entitled to restitution of the benefits they conferred

23 onto Defendants by purchasing Products and/or disgorgement of Defendants' profits from Product

24 sales.

25           Wherefore, Plaintiffs pray for judgment against Defendants, as set forth hereafter.

### PRAYER FOR RELIEF

27           WHEREFORE, Plaintiffs pray for judgment and relief against Defendants as

28

1  follows:

2      A.      That the Court declare this a class action;

3      B.      That the Court preliminarily and permanently enjoin Defendants from conducting

4  their business through the unlawful, unfair, or fraudulent business acts or practices, untrue and

5  misleading advertising, and other violations of law described in this Complaint;

6      C.      That the Court order Defendants to conduct a corrective advertising and

7  information campaign advising consumers that the Products do not have the characteristics, uses,

8  benefits, and qualities Defendants have claimed;

9      D.      That the Court order Defendants to implement whatever measures are necessary to

10 remedy the unlawful, unfair, or fraudulent business acts or practices, untrue and misleading

11 advertising, and other violations of law described in this Complaint;

12     E.      That the Court order Defendants to notify each and every member of each of the

13 Class of the pendency of the claims in this action in order to give such individuals and businesses

14 an opportunity to obtain relief from Defendants;

15     F.      That the Court award actual, punitive, treble, and/or statutory damages to Plaintiffs

16 and each member of the Class, where permitted under the consumer protection, unfair trade

17 practices, or deceptive acts law of any corresponding state or the District of Columbia;

18     G.      That the Court award damages to Plaintiffs and the members of the Class to

19 compensate them for Defendants' breach of the express warranties created with regard to the

20 Products;

21     H.      That the Court order Defendants to pay restitution and/or disgorgement of profits to

22 Plaintiffs and the members of the Class, in an amount to be determined by the Court, to ensure that

23 Defendants are not unjustly enriched by the sale of the Products nationwide;

24     I.      That the Court assess pre- and post-judgment interest on any monetary amounts

25 awarded;

26     J.      That the Court grant Plaintiffs their reasonable attorneys' fees and costs of suit

27 pursuant to any applicable state consumer protection law, the common fund doctrine, and/or any

28 other appropriate source of law or legal theory; and

K.     That the Court grant such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action so triable.

DATED:  August 09, 2013               LEXINGTON LAW GROUP


*/s/ Mark N. Todzo*
Mark N. Todzo (State Bar No. 168389)
Howard Hirsch (State Bar No. 213209)
Joseph Mann (California State Bar No. 207968)
Lucas Williams (California State Bar No. 264518)
LEXINGTON LAW GROUP
503 Divisadero Street
San Francisco, CA 94117
Telephone: (415) 913-7800
Facsimile: (415) 759-4112
mtodzo@lexlawgroup.com

Attorneys for Plaintiffs ANDREA GOLLOHER,
MARISA FREEMAN, ROBERTA CHASE,
JAMES HANKS, MICHAEL SHAPIRO,
BRENDA BROWN, GRETCHEN SWENSON,
CRYSTAL KENNY, KELLY BOTTARI, RENEE
CONOVER, and SHANISHA SANDERS

FIRST AMENDED COMPLAINT – GOLLOHER, et al. v. TODD CHRISTOPHER INT'L - Case No. C 12-06002 .    EXH 3 – 25

# EXHIBIT 4

**Murray, Peggy A.**

| | |
|---|---|
| **From:** | Lowe, James A. |
| **Sent:** | Friday, August 02, 2013 8:30 AM |
| **To:** | Murray, Peggy A. |
| **Subject:** | FW: Organix lawsuit |
| **Importance:** | High |

**Attachments:** Lexington Class Action Law Suit.pdf

---

**From:** Bill Rohr [mailto:brohr@vogueintl.com]
**Sent:** Friday, August 02, 2013 6:36 AM
**To:** Jesse S. Abrams; Lowe, James A.; David Gauntlett
**Subject:** FW: Organix lawsuit
**Importance:** High

Attached and below is my notification to Vogue's former insurance agent for Chubb and Hartford...

**From:** Bill Rohr
**Sent:** Wednesday, November 21, 2012 4:29 PM
**To:** 'Deborah Quiles'
**Subject:** Organix lawsuit
**Importance:** High

Hello Debbie,

I hope all is well with you. I have attached a new law suit that needs to be submitted to The Hartford and Chubb since it references product sales going back to 2007. Can you file these as a claim with the applicable persons referencing our policy numbers?

Thanks and Happy Thanksgiving to you and your family,

Bill



PLAINTIFF'S
EXHIBIT

**4**

8/2/2013

EXH 4 – 1

# EXHIBIT 5



**VIA CERTIFIED MAIL**

December 14, 2012

Bill Rohr
Vogue International
4027 Tampa Road #3200
Oldsmar, FL 34677     VIA EMAIL TO BROHR@VOGUEINTL.COM
AND CERTIFIED MAIL

**Re: Andrea Golloher, et al. v Todd Christopher International dba Vogue International**

Insured:     Todd Christopher International dba Vogue International
CCPS Number:     YNQ KLP 15090

Dear Mr. Rohr:

Hartford Casualty Insurance Company (The Hartford) has now had the opportunity to review the claim and lawsuit filed by consumers Andrea Golloher, Marisa Freeman, Roberta Chase, Michael Shapiro and Brenda Brown (Plaintiffs) naming Todd Christopher International dba Vogue International (Vogue) as a defendant.

We have completed our review and regret to inform you that The Hartford has no duty to defend or indemnify Vogue in this matter. Our analysis follows:

**Facts:**

In its complaint, Plaintiffs allege that Vogue's Organix cosmetic products violate the Business & Professions Code in California and similar statutes in New York, Hawaii and Washington as they relate to deceptive advertising. Plaintiffs allege that the Organix products marketing is deceptive in that the name "Organix" and other labeling statements mislead consumers as to the organic ingredient content of the products, which Plaintiffs claims is ten per cent or less. Plaintiffs claim they would not have purchased the products had they known the actual organic ingredient content. Plaintiffs seek certification of their complaint as a class action, various forms of injunctive and declaratory relief, restitution to the proposed class, disgorgement of profits, statutory damages and compensatory and punitive damages in an unspecified amount.

**The Hartford Policy:**

The Hartford issued policy number 21 UUN UV6168 to Vogue. The policy was effective from 9/11/07 to 9/11/08 and renewed until cancelation on 3/1/09. The policy provides coverage of $1,000,000 per occurrence with a $2,000,000 aggregate limit. The



PLAINTIFF'S EXHIBIT

5

ALL-STATE LEGAL®

The Hartford
P.O. Box 14265
Lexington, KY 40512-4265

EXH 5 - 1

controlling coverage form is HG 0001 (ed.0605) Commercial General Liability Coverage Form. The policy provides coverage for "bodily injury" and "property damage," caused by an "occurrence," and specific "personal and advertising injury" offenses, subject to provisions and exclusions. The policy reads in part:

## SECTION I- COVERAGES
## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

### 1. Insuring Agreement

    **a.**  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury," "property damage" to which this insurance applies…

    **b.**  This insurance applies to "bodily injury" and "property damage" only if:

        (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        (2) The "bodily injury" or "property damage" occurs during the policy period…

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

### 1. Insuring Agreement

    **a.**  We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies…

### 2. Exclusions

This insurance does not apply to:

#### a. Knowing Violation Of Rights Of Another

"Personal and advertising injury" arising out of an offense committed by, at the direction or with the consent or acquiescence of the insured with the expectation of inflicting "personal and advertising injury.

#### b. Material Published With Knowledge Of Falsity

"Personal and advertising injury" arising out of oral, written or

electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity.

### e. Material Published Prior To Policy Period

"Personal and advertising injury" arising out of oral, written or electronic publication of material whose first publication took place before the beginning of the policy period....

### g. Quality Or Performance Of Goods — Failure To Conform To Statements

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

The policy contains the following definitions (modifications made by CyberFlex Endorsement HC00880605 are identified by italics):

## SECTION V – DEFINITIONS

1.    "Advertisement" means the widespread public dissemination of information or images that has the purpose of inducing the sale of goods, products or services through:

a. (1) Radio;
   (2) Television;
   (3) Billboard;
   (4) Magazine;
   (5) Newspaper;
   *(6) The Internet*

b.    Any other publication that is given widespread public distribution.

However, "advertisement" does not include:

a.    The design, printed material, information or images contained in, on or upon the packaging or labeling of any goods or products;...

5.    "Bodily Injury" means physical:

a. Injury;

b. Sickness; or

c. Disease

sustained by a person, and if arising out of the above, mental anguish or death at any time.

16. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

17. "Personal and advertising injury" means injury, including consequential "bodily injury" arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that the person or organization occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e. Oral, written or electronic publication of material that violates a person's rights of privacy;

   f. Copying, in your "advertisement" *or on "your web site"*, a person's or organization's "advertising idea" or style of "advertisement";

   g. Infringement of copyright, slogan, or title of any literary or artistic work, in your "advertisement" *or on "your web site"*;

   h. Discrimination that results in humiliation or other injury to the feelings or reputation of a person.

20. "Property damage" means:

   a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of "occurrence" that caused it.

**Conclusion:**

According to the complaint, only Michael Shapiro claims he sustained damages though purchase of the Organix products on dates falling within the Hartford Policy effective dates, specifically between 2/08 and 2/09. The damage claims of all other Plaintiffs are claimed to have been incurred after policy cancellation on 3/1/09 and there is no potential for coverage for these claims.

The damages claimed in the lawsuit are not claimed from "bodily injury", "property damage" or "personal and advertising injury" as defined in your policy. Had damages been claimed as a result of an enumerated "personal and advertising injury" offense, which is denied, coverage would be precluded by exclusions. Damages from a knowing infliction of "personal and advertising injury" is excluded by both Coverage B exclusions a. and b. Damages from material first published prior to the policy period in which damages were incurred is excluded by Coverage B exclusion c. Damages from any breach of the purchase including but not limited to breaches of warranty are excluded by exclusion f, the breach of contract exclusion. Damages from a failure of goods to conform to with advertising statements is exclude by Coverage B exclusion g.

Moreover, to allege a covered cause of action, to come within the insuring agreement the plaintiffs must allege compensatory damages, which they have not done. The cost of complying with injunctive and declaratory relief, restitution to the proposed class, disgorgement of profits and statutory damages would not be covered damages. Punitive damages are not insurable in California. In addition, California Insurance Code § 533, which provides that "an insurer is not liable for a loss caused by the willful act of the insured," is an implied exclusionary clause statutorily read into all insurance policies.

Hartford Casualty Insurance Company provided umbrella coverage under policy 21 RHU UV5569. Coverage was provided under the Umbrella Liability Policy Provisions form XL 00030605.

The insuring agreement for the Umbrella Liability policy states the following:

## SECTION I- COVERAGES

## INSURING AGREEMENTS

### A. Umbrella Liability Insurance

> We will pay those sums that the "insured" becomes legally obligated to pay as "damages" in excess of the "underlying insurance," or of the "self-insured retention" when no "underlying insurance" applies, because of "bodily injury," "property damage," or "personal and advertising injury" to which this insurance applies caused by an "occurrence."

The definitions for the umbrella policy are the same as the primary policy pursuant to the following:

### SECTION VII – DEFINITIONS

**Except as otherwise provided in this section or amended by endorsement, the words or phrases that appear in quotation marks within this policy shall follow the definitions of the applicable "underlying insurance" policy.**

The following exclusion is applicable to this claim because there is no applicable coverage under the "underlying insurance":

### B. Exclusions

This policy does not apply to:

### 4. Personal and Advertising Injury

"Personal and advertising injury".

### EXCEPTION

This exclusion does not apply if "underlying insurance" is applicable to "personal and advertising injury" and to claims arising out of that "personal and advertising injury".

No coverage is available to Vogue under the Commercial General Liability Coverage Form or the Umbrella Coverage Form for the damages alleged in the complaint and there are no known facts extrinsic to the complaint giving rise to a potential for coverage.

Our analysis is based on the facts as we presently understand them. If there are new allegations that you feel may alter our position as to the coverage please forward that information to us for consideration. The Hartford expressly reserves its right to assert any other terms, conditions, exclusions, policy defenses or limits of liability contained in the policy should the facts be different than we currently understand them to be or there is developing law to cause us to raise additional coverage defenses.

Please contact me should you have any questions about this matter or the contents of this

letter.

Sincerely,

Thomas D. Armstrong

Litigation Consultant
Hartford Casualty Insurance Company
(877) 925-2652 x52480

CC

STAHL & ASSOCIATES INSURANCE
3939 TAMPA ROAD
OLDSMAR, FL 34677

# EXHIBIT 6

**Emily S. Skrdla**

| | |
|---|---|
| **From:** | Aaron J. Bailey |
| **Sent:** | Thursday, July 31, 2014 8:29 AM |
| **To:** | Emily S. Skrdla |
| **Subject:** | FW: Hartford CCPS# YNQ KLP 15090 (Golloher v. Todd Christopher International) |
| **Attachments:** | Golloher v. Vogue Amendment Order.pdf; Golloher v. Vogue First Amended Complaint.pdf |

**From:** Jesse S. Abrams
**Sent:** Wednesday, September 04, 2013 12:52 PM
**To:** Aaron J. Bailey
**Cc:** Gauntlett, David A. (Internal)
**Subject:** FW: Hartford CCPS# YNQ KLP 15090 (Golloher v. Todd Christopher International)

Aaron, you will want this e-mail as an exhibit in Vogue.


Jesse S. Abrams, Esq.


Gauntlett & Associates

(949) 553-1010

(949) 553-2050 FAX

This information is intended for use by the individuals or entity to which it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone and return the original message to us.

**From:** Bill Rohr [mailto:brohr@vogueintl.com]
**Sent:** Monday, August 12, 2013 1:45 PM
**To:** Jesse S. Abrams
**Subject:** FW: Hartford CCPS# YNQ KLP 15090 (Golloher v. Todd Christopher International)

Jesse – Send today per your request...

**From:** Bill Rohr
**Sent:** Monday, August 12, 2013 4:40 PM
**To:** thomas.armstrong@thehartford.com
**Subject:** RE: Hartford CCPS# YNQ KLP 15090 (Golloher v. Todd Christopher International)

Dear Mr. Armstrong,

The Court has ordered amendment of the complaint (Order and First Amended Complaint attached).

Best Regards,

Bill Rohr
Chief Financial Officer
Todd Christopher International, Inc.



**PLAINTIFF'S EXHIBIT**

**6**

ALL-STATE LEGAL®

**EXHIBIT 7**

**Lowe, James A.**

| | |
|---|---|
| **From:** | Bill Rohr [brohr@vogueintl.com] |
| **Sent:** | Wednesday, September 25, 2013 7:50 AM |
| **To:** | David Gauntlett |
| **Cc:** | Jesse S. Abrams; Lowe, James A. |
| **Subject:** | FW: Andrea Golloher, et al. v Todd Christopher International dba Vogue International |

Gentlemen,

Hartfords response...

**From:** Armstrong, Thomas D (Claim) [mailto:Thomas.Armstrong@thehartford.com]
**Sent:** Wednesday, September 25, 2013 10:34 AM
**To:** Bill Rohr
**Subject:** Andrea Golloher, et al. v Todd Christopher International dba Vogue International

**VIA CERTIFIED MAIL**

September 24, 2013

Bill Rohr
Vogue International
4027 Tampa Road #3200
Oldsmar, FL 34677

VIA EMAIL TO BROHR@VOGUEINTL.COM
AND CERTIFIED MAIL

**Andrea Golloher, et al. v Todd Christopher International dba Vogue International**
    Insured:        Todd Christopher International dba Vogue International
    CCPS Number:    YNQ KLP 15090

Dear Mr. Rohr:

Please permit this to respond to your correspondence requesting that Hartford reconsider its coverage denial in connection with litigation captioned *Golloher v. Todd Christopher International dba Vogue International,* venued in the United States District Court, Northern District of California, Case no. 12-06002. This letter is intended to supplement, not supersede, Hartford's earlier communications regarding this matter, which are hereby incorporated by reference. Based on the allegations contained in the First Amended Complaint, documents that have been provided to Hartford and the policy that was issued to your company, we advise that we will be maintaining our coverage denial in this matter.

According to the allegations contained in the First Amended Complaint, plaintiffs bring a purported class action against Todd Christopher International dba Vogue International ("Vogue") alleging that Vogue violated consumer protection and deceptive trade statutes in several states. It is alleged that Vogue is engaged in ongoing deceptive, unfair and unlawful conduct in connection with the sales and marketing of its Organix brand of personal care products. It is further alleged that in the labeling, marketing, and advertising of the products, Vogue represents that the products are organic, yet the products are composed of significant amounts of non -organic ingredients. In the First Amended Complaint, the

9/9/2014

PLAINTIFF'S
EXHIBIT
7
ALL-STATE LEGAL®

EXH 7 - 1

class is defined as consumers who purchased the product on or after October 25, 2008 to the present.

As stated in our correspondence dated December 14, 2012, there is no claim asserted that comes within the scope of coverage provided by the primary and umbrella general liability policies in effect September 11, 2008 to March 1, 2009, as there is no claim for damages arising out of a "personal and advertising injury," as that term is defined in the primary policy. Claims for false advertising do not constitute a covered offense. Further, even if the allegations contained in the First Amended Complaint asserted a potential "personal and advertising injury", which is denied, the policy contains exclusions including, without limitation, exclusion 2.g., titled Quality of Performance Of Goods – Failure to Conform to Statements, the excludes coverage for injury "arising out of the failure of goods, products or services to perform with any quality or performance made in your 'advertisement'", as well as exclusion 2.b which bars coverage for material published by or at the direction of the insured with knowledge of its falsity. Accordingly, Hartford has no contractual duty to defend Vogue and will take no further action in connection with the instant litigation.

Hartford continues to reserve all rights under the policy. The specific enumeration of the policy provisions set forth above is not intended by Hartford as a waiver of any other policy defenses. Hartford expressly reserves its right to invoke and rely on any other coverage defenses that may prove to be available under the policies or as a matter of law.

Should you have any questions regarding Hartford's coverage position, or additional facts or information which may cause us to reconsider our coverage position, please forward that information to my attention for further review.


Sincerely,
Thomas D. Armstrong


Litigation Consultant
Hartford Casualty Insurance Company
(877) 925-2652 x52480

CC:    Stahl & Associates Insurance
       3939 Tampa Road
       Oldsmar, fl 34677



**********************************************************
This communication, including attachments, is for the exclusive use of addressee and may contain proprietary, confidential and/or privileged information.  If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited.  If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this communication and destroy all copies.
**********************************************************



9/9/2014